Bernard and Odette PORT

v.

Jack HEARD, Sheriff of Harris
County, Texas.

Civ. A. No. H–84–3751.

United States District Court,
S.D. Texas,
Houston Division.

Sept. 17, 1984.

As Corrected Sept. 18, 1984.

Randy Schaffer, Randy Schaffer, P.C., Houston, Tex., for petitioners.

John B. Holmes, Dist. Atty., Brad Beers, Harris County Asst. Dist. Atty., Jim Lavine, Houston, Tex., for respondent.

## MEMORANDUM AND ORDER

DeANDA, District Judge.

Pending before the Court is the application of Bernard and Odette Port (hereinafter "the Ports") for a writ of habeas corpus. The Ports filed a motion to set bond and stay the order of contempt entered against them in the 179th District Court of Harris County, Texas for refusing to testify before the grand jury. This motion was filed at the same time as the application for writ of habeas corpus. On September 13, 1984, this Court held an expedited hearing on both the merits of the application and the motion. At the conclusion of the hearing, the application was taken under advisement and the motion was denied. The motion to stay the order of contempt and set bond sought relief which was injunctive in nature, and it is well-settled that federal courts should not enjoin state criminal proceedings absent a clear showing of extraordinary circumstances. E.g., *Sparks v. Garrison*, 446 F.Supp. 649 (M.D.N.C.1978), *aff'd*, 612 F.2d 1310 (4th Cir.1979). Concluding that the Ports had not shown such extraordinary circumstances and had not established a substantial likelihood of success on the merits, the Court denied the motion to stay. Upon a thorough review of the record and arguments before us, the Court concludes that the application for writ of habeas corpus should be denied as well.

The Court hereby enters the following Findings of Fact and Conclusions of Law

pursuant to Rule 52(a), F.R.Civ.P., which constitute the grounds for our decision to deny both the motion to stay and the application for writ of habeas corpus.

## FINDINGS OF FACT

On June 8, 1984, David Isador Port was arrested and on the following day was charged by complaint with the offense of murder in Cause No. 404,955. The complaint alleged that in Harris County, Texas, on or about June 7, 1984, David Port intentionally and knowingly caused the death of Debra Sue Schatz by shooting her with a firearm. Bail was fixed in the amount of $20,000 and David Port was released on bond signed by Bernard Port as cosurety on June 9, 1984. The case was scheduled for preliminary proceedings, including a probable cause hearing, on June 11, 1984.

David Port is the natural son of Bernard Port. Odette Port is David's stepmother. David, a seventeen year old student, resides with the Ports at 10314 Lynbrook Hollow in Houston, Texas. On June 11, 1984, the Ports appeared with David in the 179th District Court for the preliminary hearing. At that time, they were served with subpoenas to appear before the grand jury of the 176th District Court and to testify concerning the death of Debra Sue Schatz. An examining trial was set for June 22, 1984.

The Ports appeared before the grand jury but declined to testify in reliance upon the privilege against self-incrimination, whereupon the State filed motions to compel their testimony and to grant use immunity. Both motions were granted by the Court. Subpoenas were again served on the Ports, commanding them to appear before the grand jury on June 15, 1984. On that day, the Ports filed a motion to quash the subpoenas. A hearing was set for June 18, 1984, and the Court abated the grand jury subpoenas.

The motion to quash asserted a parent-child privilege based on constitutional guarantees of privacy and freedom of religion. Further, the Ports contended that the State was attempting to conduct improper pre-trial discovery via the grand jury investigations, thereby abusing the grand jury process. The Court conducted an evidentiary hearing and then denied the motion to quash and ordered the Ports to testify before the grand jury instanter.

The evidence shows that the grand jury was investigating whether there was sufficient probable cause to indict David Port on charges of murder or capital murder. Further, the investigation sought to determine the possibility of affirmative defenses, such as insanity. Specifically, the grand jury sought to obtain information from the Ports regarding (1) their activities, communications and observations regarding the day and events in question; (2) any statements made to them by David Port regarding the alleged offense; (3) possible motives for the alleged homicide; (4) evidence which might indicate the commission of a capital offense; and (5) David's background and his social, emotional, and mental histories. While the State's prosecutors have conceded that pretrial discovery could result as an incidental by-product of the grand jury's investigations, it is clear that pretrial discovery was not their primary or principal reason for continuing their efforts before the grand jury.

The Ports appeared again before the grand jury and reiterated their refusal to testify. The refusal was predicated on the privilege against self-incrimination and on an asserted parent-child privilege. As a result of this refusal, the Ports appeared before the Court and were admonished of the consequences of their continued refusal to testify as to "relevant and proper questions." The Court then ordered the Ports to show cause why they should not be held in contempt. The show cause hearing was set for June 27, 1984.

David Port appeared before the 179th District Court on June 22, 1984, for his examining trial. David waived his right to indictment (pursuant to Art. 1.141 of the Texas Code of Criminal Procedure) in open court and in writing. The Court accepted the waiver of indictment, entered a plea of

not guilty and dismissed the examining trial as moot.

At the conclusion of the Ports' show cause hearing (on June 27, 1984), the Court found them to be in contempt for failing and refusing to answer questions properly propounded to them before the grand jury. Fines of $500 were imposed on each of the Ports and they were ordered to be confined in the Harris County jail until they purged themselves of the contempt.

The Ports filed an application for writ of habeas corpus and a motion for bond in the Texas Court of Criminal Appeals. That Court ordered the Ports released on bonds and ultimately granted them habeas corpus relief based on certain procedural irregularities in the contempt orders. The Court's opinion did not reach the merits of the Ports' contentions regarding the privilege issues and the challenges to the propriety of the grand jury proceedings.

On August 8, 1984, the Ports were again served with subpoenas to appear and testify before a grand jury (for the 179th District Court). The Ports filed a motion to quash the subpoenas or, in the alternative, for the issuance of a protective order. Evidence and arguments were presented to the Court, and on August 21, 1984, the Court denied the Ports' requests, granted them use immunity upon request of the State, and ordered that they return to testify before the grand jury. They again refused to testify, asserting a parent-child privilege, a husband-wife privilege, and the privilege against self-incrimination. Moreover, they contended that the questions were beyond the scope of a proper grand jury investigation.

The Ports returned to the 179th District Court for a hearing to determine the propriety of their refusal to testify before the grand jury. The Court concluded that the refusal to testify was improper, that the questions propounded to them were relevant and proper, and that the Ports intended to persist in their refusal. A show cause hearing was held on August 28, 1984, and the Court concluded that the Ports were in contempt. The Court imposed fines of $500 each and ordered that the Ports be confined in the Harris County jail until they purged themselves of the contempt. Motions for bail were denied, and the Ports were placed in constructive custody until they were freed by a subsequent order of the Court of Criminal Appeals granting them release on bond.

An application for writ of habeas corpus was filed with the Court of Criminal Appeals. By order dated September 10, 1984, that court denied the application without discussion of the merits. The September 10, 1984, order also withdrew the order granting the Ports release on bond. As a result, the Ports surrendered to the Sheriff of Harris County, Texas, on September 12, 1984, and they are currently confined in the Harris County jail.

Debra Sue Schatz was acting in the course and scope of her employment as a United States Postal Service mail carrier at the time of her death. Hence the United States Postal Inspector became involved in the joint investigation conducted by state and federal authorities. Her murder could be prosecuted in federal court as could any offense by a person who aided and abetted the murder or who obstructed justice after its commission. To date, the federal authorities have filed no charges of any kind relating to the murder of Ms. Schatz. The United States Attorney for the Southern District of Texas has neither sought nor obtained any immunity for the Ports.

## CONCLUSIONS OF LAW

The Court has jurisdiction over the instant matter by virtue of 28 U.S.C. §§ 1331, 2241 and 2251.

■ At the outset, the Court concludes that the state district court had jurisdiction and acted properly in the issuance of its contempt orders regarding the various procedural requirements found in the Texas Code of Criminal Procedure. *See e.g.,* Art. 20.15 Tx.C.C.P. Further, the contempt orders are sufficiently specific to notify the Ports of the nature of their contempt.

We turn next to the various constitutional issues presented in the Ports' application. The Ports contend they were denied due process when the district court held them in contempt after that court had already accepted the defendant's (David Port) waiver of indictment. The gist of this contention is that the district court lacked any authority to hold the Ports in contempt for refusing to testify before the grand jury when the only legitimate purpose for their appearance was satisfied as a result of the defendant's waiver of indictment pursuant to Art. 1.141, Tx.C.C.P. The Ports' contention must fail for a number of reasons, as set forth below.

 First, by its express terms, Art. 1.141 is limited to noncapital offenses. Hence a person may *not* waive an indictment of a capital felony. At the time David Port entered his waiver, the grand jury was still investigating the possibility of indicting for capital murder. Therefore any waiver of indictment for noncapital homicide could not possibly sound the death knell for ongoing grand jury investigations. Moreover, it is eminently possible that the grand jury sought to investigate the propriety of issuing indictments against persons who may have aided or abetted the alleged murderer of Ms. Schatz. In light of these considerations, it would be ludicrous to hold that David Port's waiver of indictment should foreclose any further inquiry into the matters surrounding the death of Ms. Schatz.

 Second, there are profoundly significant policy reasons for rejecting the Ports' arguments. Traditionally, the grand jury has been accorded very wide latitude to inquire into violations of criminal law. No judge presides over its proceedings. It deliberates in secret and its proceedings are inquisitorial rather than adversarial in nature; the scope of its inquiries is not limited by questions of propriety or forecasts of the probable result of its investigations, or by doubts as to whether any particular individual will be found properly subject to an accusation of some crime. *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *Blair v. United States,* 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919). The broad scope of a grand jury's powers reflects its special role in insuring fair and effective law enforcement. The grand jury conducts *ex parte* investigations to determine whether a crime has been committed *and* whether criminal proceedings should be instituted against any person. *United States v. Calandra,* 414 U.S. 338, 343–344, 94 S.Ct. 613, 617–618, 38 L.Ed.2d 561 (emphasis added) (1974). Hence it necessarily follows that a grand jury has the power—and even the duty—to investigate a crime beyond the mere showing of probable cause to indict. It may inquire into possible affirmative defenses and the like in order to determine whether a prosecution should proceed. To permit some unilateral attempt by a defendant to cut off such continuing investigations would be unsound and contrary to public policy. Society's interests are best served by a thorough and extensive investigation which exhausts every clue and possibility relating to a crime. *Calandra, supra* at 344, 94 S.Ct. at 618 and cases cited therein.

 The validity of an indictment is not affected by the character of the evidence presented, even if the information is obtained in violation of a person's privilege against self-incrimination. *Calandra supra; Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). The power of a court to compel persons to appear and testify before it is firmly established. *E.g., Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Citizens are not constitutionally immune from grand jury subpoenas, and the duty to testify reflects basic obligations which every citizen owes to his or her government and to society at large. *Branzburg v. Hayes, supra,* 408 U.S. at 682–688, 92 S.Ct. at 2657–2660. The duty to testify before a grand jury has been regarded as so necessary to the administration of justice that the witness' personal interest in privacy must yield to the public's overriding interest in full disclosure.

*Calandra, supra,* 414 U.S. at 345, 94 S.Ct. at 618, citing with approval to *Blair v. United States,* 250 U.S. 273, 281, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919).

In view of the above authorities, the Court concludes that the state court acted properly in compelling the Ports to testify even after the indictment had been waived. This is so even in light of the Ports' claims to privacy rights in refusing to testify. *See Calandra* and *Blair.* Art. 1.141 cannot be used by a defendant to hamstring a grand jury investigation. The Court refuses to accept the Ports' contentions to the contrary.[1] *Accord, King v. State,* 473 S.W.2d 43 (Tex.Crim.App.1971).

■ Third, assuming *arguendo* that the above conclusions are incorrect, the law is well-settled that the Ports, as grand jury witnesses, lack standing to raise objections concerning the necessity or the propriety of grand jury investigations or to challenge the jurisdiction of the grand jury over them regarding the particular subject matter that is under investigation. *Calandra, supra; Blair, supra, esp.,* 250 U.S. at 282, 39 S.Ct. at 471; *Andino v. State,* 645 S.W.2d 615 (Tex.App.—Austin 1983). The Ports' reliance on *Ex parte Salfen,* 618 S.W.2d 766 (Tex.Crim.App.1981), is misplaced. In *Salfen,* a witness was found in contempt for refusing to answer questions relative to a defendant's request for bail reduction. The refusal occurred at a hearing which was held after bail had been reduced and the defendant had been released on bond. Hence there was no actual related proceeding or controversy before the trial court, and it therefore had no authority to hold the witness in contempt. Here, there is an ongoing grand jury investigation, and thus *Calandra, Blair* and *Andino* are controlling. The Court concludes that the Ports lack standing to challenge the propriety of the grand jury proceedings out of which their contempt flows.

■ The Ports contend that they were denied due process because the State at-

tempted to use the grand jury process to obtain pretrial discovery. This contention is ill-founded since it is clear from our earlier discussion that they lack standing to raise such challenges. Assuming they have standing, the contention is defective for the following reasons.

■ It is true that it is improper to use the grand jury for the purpose of preparing an already pending indictment for trial, and that it is a misuse of the grand jury to use it as a substitute for discovery. *Beverly v. United States,* 468 F.2d 732, 743 (5th Cir.1972). However, as in *Beverly,* the situation before this Court is *not* one where the sole or principal purpose in further inquiry is to gather information for trial. Further, the strong presumption as to the regularity of the acts of public officials (the grand jury and the prosecutors) requires courts to presume that such officials have acted properly in discharging their duties absent a clear showing to the contrary. *Beverly, supra,* at 743 and cases cited therein. The record before us indicates only that some pretrial discovery may flow from the continuation of proper and relevant grand jury investigations. Hence we may not assume that no further information appropriate to those investigations will be obtained from the Ports' answering of the propounded questions. *Id.,* at 743–744.

The Ports claim that a parent-child privilege exists under the federal Constitution based on family privacy and the free exercise of religion. The Ports urge this Court to recognize a parent-child privilege so as to assure family harmony and intrafamilial privacy rights. Moreover, they argue that they are entitled to assert this privilege because of their Jewish faith. The Ports contend that rabbinical law prohibits Jewish parents and children from testifying against one another in canonical proceedings. The Ports believe this "privilege" should be imposed on American jurispru-

---

**1.** The fact that upon proper entry of a waiver, the accused *"shall* be charged by information" (emphasis added) does not in any way mean

that the legislature intended to thereby foreclose any further grand jury proceedings.

dence based on the First Amendment's guarantee of freedom of religion. In support of this position, they rely primarily on *In re Grand Jury Proceedings (Agosto)*, 553 F.Supp. 1298 (D.Nev.1983) and *In re Grand Jury Proceedings (Greenburg)*, 11 Fed.R.Evid.Serv. 579 (D.Conn.1982).

*Agosto* upheld a witness's refusal to testify against his father based on privacy expectations regarding intrafamilial communications. The *Greenburg* court accepted arguments such as those before us and upheld a mother's refusal to testify about confidential communications with her daughter. A review of the authorities in this area of the law shows that *Agosto* and *Greenburg* are extreme departures from the traditional rule in federal courts that, other than the spousal privilege, there is no privilege which permits a person not to testify against his or her family members. *See Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980); *In re Grand Jury Proceedings (Matthews)*, 714 F.2d 223 (2d Cir.1983); *United States v. Jones*, 683 F.2d 817 (4th Cir.1982); *In re Grand Jury Proceedings (Starr)*, 647 F.2d 511, 512–13 (5th Cir.1981); *United States v. Penn*, 647 F.2d 876, 885 (9th Cir.1980) (*en banc*).

■ The federal courts have generally approached the creation or recognition of new privileges against giving testimony with extreme caution. The rationale behind this caution is based on the public's right to all testimony in the absence of a privilege protecting "weighty and legitimate" interests. *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). The individual's "power" to withhold information must be always balanced against society's interest in the effective administration of criminal justice. It is for these reasons that privileges are disfavored generally and are created or newly-recognized but rarely. Perhaps the most dramatic recent instance of this judicial approach is found in *United States v. Nixon*, *supra*, where the President was ordered to turn over certain materials despite his claim of executive privilege.

■ In the absence of a specific federal statute or rule, the privileges of witnesses in federal courts are governed by "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501. Noting first that the common law and statutes of Texas do not recognize a parent-child privilege (discussed more fully *infra*), we must apply "reason and experience" to the instant question. As alluded to above, the spousal privilege has been traditionally recognized by the courts while no other familial privileges have been recognized (except in aberrational cases such as *Agosto*). One explanation for this lies in the fact that marriage creates a unique family relationship (between husband and wife) which society highly values but which is rather easily destroyed through estrangement and divorce. On the other hand, only the most extraordinary events can ever destroy the relations of parent and child, brother and sister, and so forth. Furthermore, traditionally parents have borne the responsibility for disciplining wayward children in various ways, so that it cannot be reasonably said that parents should be shielded from giving testimony against children who may have committed criminal acts. If the law of intrafamily privilege were extended beyond the narrow spectrum of spousal privilege, it would be very difficult to stop at the parent-child level. This is so since the "sanctity of the family" argument could then be logically extended to brothers, sisters, grandparents, cousins, nieces, nephews, aunts, and uncles. We would similarly face very difficult issues concerning whether the privilege would extend to stepparents, stepchildren, in-laws and other persons related to a potential witness only by way of marriage (brothers-in-law, for example). Soon we would face a situation where testimony could not be elicited from vast numbers of relatives, both close and distant. Such a situation could well present serious impediments to the gathering of evidence in a criminal proceeding. When the scope of such new privileges

were then tested, the courts would find themselves mired in a plethora of jurisprudential problems while the public's right to elicit testimony languished. Hence this Court concludes that it would be unwise to find any family privilege beyond that of the well-established spousal privilege. This Court agrees with the courts in *Matthews, Starr, Jones* and *Penn* and declines to follow *Agosto.* We simply cannot discern a constitutional mandate for the parent-child privilege, and the Court concludes that reason and experience strongly militate against the creation of such a privilege. *See also, Blair, supra,* 250 U.S. at 281, 39 S.Ct. at 471 (privacy interests must yield to public's right to testimony).

■ The leading case regarding the contention that the Rabbinical parent-child privilege should be imposed on the State is *Smilow v. United States,* 465 F.2d 802 (2d Cir.1972), vacated on other grounds, 409 U.S. 944, 93 S.Ct. 268, 34 L.Ed.2d 215 (1972). Relying in part on *Brazburg v. Hayes, supra,* the *Smilow* court rejected the contention in light of the compelling state interest in uncovering evidence related to serious crimes of violence. *Id.,* at 804–805. *See also, Matthews, supra* at 225; *Huss v. United States,* 482 F.2d 38 (2d Cir.1973). The reasoning of *Smilow* is sound, and based thereon this Court rejects the Ports' contentions to the contrary.

The Ports, tacitly acknowledging that the laws of Texas do not recognize a parent-child privilege, contend that they have been denied equal protection of the laws as a consequence of Texas recognizing the spousal privilege but declining to recognize parent-child privilege. In Texas, only six categories of witnesses may claim a privilege against testifying or be disqualified as incompetent to testify: the insane, children of insufficient intellect, attorneys, persons involved in the treatment of drug abuse, spouses and clergymen. Art. 38.10, Tx.C.C.P.[2] Texas recognizes no other intrafamily privileges. The Ports argue that this distinction in the law is without a rational relation to any legitimate state interest.

■ The distinction between the husband-wife and parent-child relationships clearly does not involve either fundamental rights or inherently suspect classifications. *Cf., Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). Therefore, our review of this distinction in Texas law is limited to determining whether it is rationally related to a legitimate state interest. *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976).

■ A careful review of the provisions regarding privilege (Tx.C.C.P., Art. 38.10, 38.101, 38.11, etc.) demonstrates a consideration by the Texas legislature of the question of when the State's legitimate interest in obtaining all relevant evidence is outweighed by the countervailing interests of society in preserving certain confidential relationships. The legislature apparently has selected those relationships it believes are most subject to injury by testimony concerning confidential communications. This selection process is proper and reasonable. The legislature is not compelled to provide privileges to *all* confidential communications or relationships. The equal protection clause does not require that a State must choose between attacking every aspect of a problem or not attacking it at all. *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Further, courts may not sit as super legislatures regarding such policy determinations as those at issue here. *Dukes, supra,* 427 U.S. at 303, 96 S.Ct. at 2516. If such policy determinations are reasonable and related to a legitimate state interest, then the mandates of the equal protection clause are satisfied. In light of our earlier discussion regarding the asserted parent-child privilege, it necessarily follows that the legislature's determinations are reasonable and relate to a legitimate compelling state interest.

**2.** The civil statutes also recognize a type of psychotherapist-patient privilege which is not at

issue here.

■■■■ The Ports were granted use immunity by the prosecutors in this case.[3] If the grant of immunity was valid, then the Ports cannot be heard to complain that their privilege against self-incrimination has been violated by the State. *Kastigar v. United*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The Ports, however, have raised a serious challenge to the validity of the immunity given to them.

■■■■ Courts have no inherent power to grant immunity to witnesses who assert the privilege against self-incrimination; witness immunity is a statutory creature which commits the decision to grant or deny immunity to the discretion of the executive branch of government (i.e., prosecutors). *E.g., United States v. Lenz*, 616 F.2d 960, 962 (6th Cir.), *cert. denied*, 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980). Similarly, mere prosecutorial promises do not suffice. The prosecutor must, if he or she wishes to confer immunity, do so pursuant to a specific statutory grant of authority and then obtain the consent of the court. *Id., also State v. Brown*, 321 A.2d 478 (Maine 1974); *Government Ethics Commission v. Cahill*, 225 Kan. 772, 594 P.2d 1103 (1970); *Apodaca v. Viramontes*, 53 N.M. 514, 212 P.2d 425 (1949).

The Ports contend that the prosecutor's grant of use immunity was invalid because it was not based on a specific statute. Further, they point out that Texas has enacted various specific statutes which provide for immunity in specific types of cases, none of which are applicable here. The State argues that the authority to grant use immunity is derived from Art. 32.02, Tx.C.C.P., the "nolle prosequi" statute.

At one time, Texas had some nineteen specific statutes granting immunity to varying degrees regarding various specific crimes. Coexistent with these statutes, Art. 32.02 and its direct predecessor, Art. 577 (1925), have been in effect for many years. Venzke, *Texas Immunity Law*, 10 Hou.L.R. 1120 (1973), *esp.* at 1124 (n. 38),

1129–1130. Art. 32.02 empowers the attorney representing the State to dismiss a criminal action at any time, subject to the consent of the presiding judge. A number of early Texas cases specifically held that this provision was sufficient to empower prosecuting attorneys to exercise discretion in granting use immunity to witnesses and putative defendants. That construction of Art. 32.02 has been consistently held by the Court of Criminal. Appeals, and has been reiterated in recent opinions. For example, in *Ex parte Moorehouse*, 614 S.W.2d 450 (Tex.Crim.App.1981), Judge Clinton noted in a concurring opinion that:

> Though a procedure for grant of immunity has not been expressly provided by the Legislature, as the Court demonstrated in *Ex parte Muncy*, [72 Tex.Cr.R. 541] 163 S.W. 29 (1914), "The right under our law of the district attorney, with the knowledge and consent of the district judge, to guarantee immunity from prosecution and punishment has never been seriously questioned in this state," *id.* [163 S.W.] at 38. The then extant statutory authority for the grant, *id.*, at 45 and 54, similar to provisions in predecessor codes cited in earlier decisions to the same effect, e.g. *Barrera v. State*, 42 Tex. 260, 263 (1875); *Cameron v. State*, 32 Tex.Cr.R. 180, 22 S.W. 682 (1893); *Ex parte Greenhaw*, 41 Tex.Cr.R. 278, 53 S.W. 1024 (1899), have since been melded into Article 32.02. *See Washburn v. State*, 164 Tex.Cr.R. 448, 299 S.W.2d 706 (1956).

*Id.*, at 453, n. 3. Moreover, this construction given to the nolle statute by the early decisions was expressly reaffirmed in *Ex parte Joseph*, 172 Tex.Cr.R. 355, 356 S.W.2d 789, 791 (Tex.Crim.App.1962), *overruled on other grounds, Ex parte Shorthouse*, 640 S.W.2d 924 (Tex.Crim.App. 1982). *See also, Washburn v. State*, 167 Tex.Cr.R. 125, 318 S.W.2d 627 (1958); *Ex parte Copeland*, 91 Tex.Cr.R. 549, 240 S.W. 314 (1922). Hence it is clear that the

---

**3.** "Use" immunity means that any testimony given by the witness will not be used against him in any criminal prosecution. "Transactional" immunity confers absolute immunity from prosecution in return for the testimony of the witness.

State's highest criminal appellate court has long recognized the binding and valid effect of a grant of use immunity made pursuant to Art. 32.02 and its predecessors.

■ The most recent case wherein the Court of Criminal Appeals had an opportunity to address this question regarding immunity is in the instant case. Although the court's opinion in *Ex parte Port,* (No. 14,336, Tex.Crim.App., Sept. 10, 1984) did not directly address the merits, the Ports' claim was obviously rejected. Thus there has been no procedural default for purposes of the exhaustion of available state remedies, and the issue has been fairly presented to, considered by, and rejected by the Court of Criminal Appeals. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Escobedo v. Estelle,* 650 F.2d 70 (5th Cir.1981).

The Ports argue that, even in light of the above, the existence of specific immunity statutes renders any reliance on Art. 32.02 null and void. This contention must fail for two reasons. First, the various specific immunity statutes grant particular types of immunity (some of which exceed the constitutional requirements) to specific types of persons. For example, Sec. 47.09, Tex.Penal Code, grants immunity to a *party to an offense* (emphasis added) engaged in criminal gambling activities, extends transactional immunity and applies the immunity to any proceeding before a court or any other government agency. Sec. 43.06, Tex. Penal Code, extends the same type of immunity as that found in Sec. 47.09 in the context of aggravated promotion of prostitution. Similarly, Sec. 71.04 of the Penal Code offers the more limited use immunity to parties to an offense committed in the course of organized criminal activity. Art. 52.05, Tx.C.C.P., grants immunity for testimony before a court of inquiry, which is an inquiry forum seldom used in Texas. A final example is Art. 5205, Tex.Rev.Civ. Stat.Ann., which together with Art. 5202 allows the summoning of witnesses upon the application of various officials (such as the attorney general) to give immunized testimony regarding violations of the State's labor laws. The immunity granted by Art. 5205 is transactional.

The only logical conclusion to be drawn from the above statutory review is that the legislature has seen fit to authorize immunity grants of various types for very specific circumstances. However, none of these provisions either expressly or impliedly limits the power to grant use immunity to uncooperative witnesses. Rather, they address granting immunity to defendants and accomplices charged with specific crimes or else involve unique legal areas, such as Art. 5205.

The second reason why the contention must fail is because the legislature presumably is aware of the well-settled case law which construes Art. 32.02 as specifically conferring authority on prosecuting attorneys to offer use immunity to witnesses or defendants. The legislature has, by its silence on the matter, tacitly approved the Courts' construction of Art. 32.02.

■ Based on all of the above, the Court concludes that Texas has enacted specific statutory authority for prosecutors to grant effective and binding use immunity which satisfies constitutional requirements vis-a-vis the self-incrimination privilege. *See Kastigar, supra.* Since this is so, the Ports' self-incrimination arguments must fail.

■ The Ports claim that compelling them to testify before the grand jury violates their husband-wife privilege. Art. 38.11, Tx.C.C.P. This argument is without merit for two reasons. First, a review of the sealed transcripts shows that the Ports simply are not being asked to give testimony of any sort against one another. If one of them were to give testimony in response to the questions at issue which did in fact implicate criminal activities on the part of the other, such testimony could not be admitted against them, pursuant to Art. 38.-11. Second, the case of *In re Grand Jury Matter,* 673 F.2d 688 (3d Cir.1982), upon which the Ports rely, is clearly inapposite to the instant facts.

Finally, the Ports contend that the grant of use immunity in state court is not sufficient protection from use by federal prosecutors, should criminal proceedings be commenced in federal court. This contention was disposed of by the Supreme Court's holding in *Murphy v. Waterfront Commission of New York Harbor*, 378 U.S. 52, 79, 84 S.Ct. 1594, 1609, 12 L.Ed.2d 678 (1964). The *Murphy* court squarely held that:

> (A) state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him. We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Governments in investigating and prosecuting crime, the Federal Government must be prohibited from making any such use of compelled testimony and its fruits. This exclusionary rule, while permitting the States to secure information necessary for effective law enforcement, leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity.

Hence it is crystal clear that the federal prosecutors could make no use of any self-incriminating testimony elicited by the state prosecutors in this case. *See also Ex parte Richardson*, 639 S.W.2d 701 (Tex. App.—Tyler 1982).

## CONCLUSION

For the reasons set forth above, the Court concludes that the Ports have suffered no deprivations of their constitutional and legal rights. Their confinement in the Harris County jail for contempt is proper.

It is hereby ORDERED that the Petitioners' application for writ of habeas corpus be DENIED in all respects.

A final judgment will be entered accordingly.

## FINAL JUDGMENT

In accordance with the Memorandum and Order filed in the above-referenced cause on this date, judgment is hereby entered for the Defendant, Jack Heard, Sheriff of Harris County, Texas.

All taxable costs are hereby assessed against the Plaintiffs, Bernard and Odette Port.

This is a Final Judgment.