**UNITED STATES of America,**
**Plaintiff,**

v.

**Buford O'Neal FURROW,**
**Jr., Defendant.**

**No. CR 99–838 NM.**

United States District Court,
C.D. California.

Sept. 19, 2000.

Barbara Bernstein, Special Asst. U.S. Attorney, Carolyn Wittcoff, Micahel J. Gennaco, Michael Terrell, Asst. U.S. Attorneys Criminal Division, Los Angeles, CA, for plaintiff.

Marilyn E. Bednarski, Seal Kennedy, William H. Forman, Office of the Federal Public Defender, Los Angeles, CA, Judy C. Clarke, Office of the Federal Public Defender, Spokane, WA, for defendant.

## ORDER DENYING DEFENDANT'S MOTION FOR SANCTIONS FOR ABUSE OF THE GRAND JURY

MANELLA, District Judge.

### I. INTRODUCTION

Criminal defendant Buford O'Neal Furrow, Jr. ("Defendant") is facing criminal prosecution for the August 10, 1999 killing of a U.S. postal worker, Joseph Ileto, the shooting of five individuals at the North Valley Jewish Community Center ("NVJCC"), and various firearms offenses. The initial indictment was issued on August 19, 1999—nine days after commission of the charged crimes. It contained only three counts: murder of a federal employee (18 U.S.C. § 1114); use of a firearm in the commission of a felony resulting in death (18 U.S.C. § 924(c)(j)); and possession of a firearm by a felon (18 U.S.C. § 922(g)(1)). In the three months that followed, the grand jury heard testimony from 43 witnesses on a variety of topics. On December 2, 1999, the grand jury returned a superseding indictment charging Defendant with thirteen additional counts: six counts alleging interference with federally protected activities on account of the victim's race, color, religion, or national origin (18 U.S.C. § 245); five counts alleging use of a firearm in the commission of a crime of violence (18 U.S.C. § 924(c)); unlawful possession of a machinegun (18 U.S.C. § 922(o)(1)); and possession of an unregistered modified firearm (26 U.S.C. § 5861(d)). Now pending before the court is Defendant's motion for sanctions based on the government's alleged abuse of the grand jury.[1]

### II. DISCUSSION

#### A. *Legal Standard*

■ The Fifth Amendment provides: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury...." U.S. Const., Amend. V. "A grand jury has broad investigative powers to determine whether a crime has been committed and who has committed it. The jurors may act on tips, rumors, evidence offered by the prosecutor, or their own personal knowledge." *United States v. Dionisio*, 410 U.S. 1, 15, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (citing *Branzburg v. Hayes*, 408 U.S. 665, 701, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) ("The investigative powers of the grand jury are necessarily broad if its public responsibility is to be adequately discharged.")); *Port v. Heard*, 594 F.Supp. 1212, 1217 (S.D.Tex.1984) ("Traditionally, the grand jury has been accorded wide latitude to inquire into violations of criminal law.").

■ "The investigative power of a grand jury does not necessarily end with the return of an indictment." *United States v. Jones*, 129 F.3d 718, 723 (2d Cir.1997). Rather, "[a] grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined...." *Branzburg v. Hayes*, 408 U.S. at 701, 92 S.Ct. 2646. However, use of the grand jury as a means for criminal discovery is prohibited. *See, e.g., In re Antitrust Grand Jury Investigation*, 714 F.2d 347, 349 (4th Cir.1983); *United States v. Kovaleski*, 406 F.Supp. 267, 269 (E.D.Mich. 1976) ("[T]he calling of witnesses before a grand jury for the dominant purpose of gathering evidence for use in a pending case is improper.").

"Once a defendant has been indicted the government is precluded from using the grand jury for the 'sole or dominant purpose' of obtaining additional evidence against him."[2] *Moss*, 756 F.2d at 332; *see*

---

1. As part of his motion, Defendant seeks discovery of grand jury transcripts for sessions prior to August 26, 1999. Mot., at 6, 13 n. 9. Because the government provided Defendant with the transcript of the testimony presented to the grand jury before the return of the original indictment contemporaneous with the filing of its opposition to the instant motion, Defendant's request appears to be moot. Opp., at 5 n. 3.

2. This test has been adopted by the vast majority of circuits. *See Moss*, 756 F.2d at 332 (collecting cases).

*also United States v. Dardi,* 330 F.2d 316, 336 (2d Cir.), *cert. denied,* 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964) ("It is improper to utilize a Grand Jury for the sole or dominating purpose of preparing an already pending indictment for trial.").

■ "The 'dominating purpose' test presupposes that the government can have more than one purpose in calling a witness before the grand jury." *Kovaleski,* 406 F.Supp. at 270; *In re Antitrust Grand Jury Investigation,* 714 F.2d 347, 349 (4th Cir.1983) ("Even if we assume the government sought the subpoena for an improper purpose, the finding that it was also sought for a legitimate purpose is not clearly erroneous."). For example, the government may properly use the grand jury "to identify or investigate other individuals involved in criminal schemes, or to prepare superseding indictments against persons already charged." *United States v. Jones,* 129 F.3d 718, 723 (2d Cir.1997) (citing *United States v. Sasso,* 59 F.3d 341, 352 (2d Cir.1995); *United States v. Leung,* 40 F.3d 577, 581 (2d Cir.1994)). The grand jury also "may inquire into possible affirmative defenses and the like in order to determine whether a prosecution should proceed." *Port v. Heard,* 594 F.Supp. at 1217 (grand jury properly investigated existence of affirmative defenses, such as insanity); *cf. Dionisio,* 410 U.S. at 16–17, 93 S.Ct. 764 (The grand jury's "mission is to clear the innocent, no less than to bring to trial those who may be guilty."); *United States v. Mandujano,* 425 U.S. 564, 573, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976) (The grand jury "function[s] as a shield against arbitrary accusations.").

■ Proof that the government derived an incidental benefit at trial from the disputed grand jury testimony is insufficient to establish that prosecutors have abused the grand jury. *See United States v. Ruppel,* 666 F.2d 261, 268 (5th Cir.1982) (con-

cluding that the government did not misuse the grand jury by calling convicted coconspirator to testify, even though testimony may have incidentally benefitted prosecution of defendant); *In re Grand Jury Proceedings (Johanson),* 632 F.2d 1033, 1040–41 (3d Cir.1980) ("[A] good faith inquiry into other charges within the scope of the grand jury's lawful authority is not prohibited even if it uncovers further evidence against an indicted person.") [hereinafter *Johanson*].

■ "[T]he law presumes, absent a showing to the contrary, that a grand jury acts within the legitimate scope of its authority." *United States v. R. Enterprises, Inc.,* 498 U.S. 292, 300, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991) (citing *United States v. Mechanik,* 475 U.S. 66, 75, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) (O'Connor, J., concurring) ("The grand jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process.")); *Ruppel,* 666 F.2d at 268 (applying "the presumption that the grand jury and the prosecutor have properly performed their duties" to reject defendant's claim of grand jury abuse); *cf. In re Antitrust Grand Jury Investigation,* 714 F.2d at 350 ("[A] court should not intervene in the grand jury process absent a compelling reason."). Accordingly, Defendant bears the burden of demonstrating that an abuse has occurred.[3] *See, e.g., United States v. Breitkreutz,* 977 F.2d 214, 217 (6th Cir.1992) ("[A] defendant must show that the challenged witnesses were not called to accomplish a proper objective."); *Johanson,* 632 F.2d at 1041–42 (defendant bears burden of showing sole or dominant purpose was to prepare for pending trial).

---

**3.** Defendant maintains that he has presented sufficient evidence, in the form of grand jury transcripts, to shift onto the government the burden of showing proper use of the grand jury. Mot., at 13. Assuming a sufficient factual showing of questions apparently unrelated to areas appropriate for grand jury inquiry could result in such burden-shifting, as discussed below, the court finds Defendant has not made such a showing.

## B. Application

### 1. Renewal of Prior Motions

The government first argues that the instant motion is merely a renewal of defense motions filed November 17, 1999 and November 24, 1999. Opp., at 4–5. The November 17, 1999 motion sought an order staying the grand jury proceedings on the ground that the government was using the grand jury to gather penalty phase evidence against Defendant. At that time, defense counsel did not know the identity of the witnesses who had testified and had not had the opportunity to review the grand jury transcripts. Reply, at 3. Judge Paez denied emergency relief, citing a lack of factual support, and scheduled a hearing on the motion. Defendant's November 24, 1999 motion asked the court to quash certain grand jury subpoenas and again sought a stay of the grand jury investigation. On December 6, 1999, Defendant withdrew the pending motions, as the grand jury had returned a superseding indictment and then disbanded. Because Defendant did not receive a full hearing on the merits of his prior motions and because the instant motion is based on new evidence—the grand jury transcripts—the court concludes that the instant motion has not been previously decided and will proceed to address the merits.

### 2. Improper Use of the Grand Jury

Defendant claims that the government used the grand jury for the improper purpose of gathering evidence for use in connection with the penalty phase of Defendant's upcoming trial. Mot., at 13. Defendant specifically objects to the government's interrogation of witnesses on the following topics: Defendant's mental health; his use of prescription medication, illicit drugs, and alcohol; his ability to behave as "functioning member of society"; his sexual relationships and female companions; his tendency to become angry, initiate conflicts, or issue threats. Mot., at 2. The government contends that the primary purpose of the grand jury investigation was threefold: 1) to identify the individuals responsible for the August 10, 1999 shootings; 2) to determine whether Defendant possessed the requisite religious and racial animus to be charged under Section 245; and 3) to determine whether Defendant possessed the requisite specific intent to be charged under Section 245. Opp., at 7–22.

■ Defendant argues that the government acted improperly by summoning Defendant's personal friends and family members, none of whom witnessed the August 10, 1999 shootings, to testify before the grand jury. Mot., at 9. The grand jury is not limited, however, to seeking information from individuals present at the crime scene. Rather, it is entitled to question "persons suspected of no misconduct but who may be able to provide links in a chain of evidence relating to criminal conduct of others." *United States v. Mandujano*, 425 U.S. 564, 573, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976); *see also United States v. Moss*, 756 F.2d at 332 (4th Cir.1985) ("Lacking clairvoyance, grand juries must be allowed to investigate freely individuals suspected of involvement in crimes for which indictments have already been issued."). The fact that non-percipient witnesses were summoned before the grand jury raises no inference of impropriety.

■ Defendant concedes that the government may explore the existence of any co-conspirators or accomplices.[4] Reply, at 5. However, Defendant argues that the prosecution improperly questioned

---

4. "When applied correctly the sole or dominant purpose test plainly permits grand juries to investigate additional individuals who become suspects only after an indictment has been returned, while precluding improper use of the grand jury for discovery." *Moss*, 756 F.2d at 332; *see also Breitkreutz*, 977 F.2d at 217 ("[W]itnesses may be legitimately summoned to testify before a grand jury for the purpose of investigating persons who may be involved in a previously investigated conspiracy but who were unknown to the grand jury at the time."). Defendant concedes that the government may explore the existence of any co-conspirators or accomplices. Reply, at 5.

these witnesses on subjects bearing on the penalty phase of the trial, such as defendant's character and personal practices. Reply, at 6. According to Defendant, examples of such improper interrogation include questions about the nature of Defendant's relationship with a lesbian friend, his attitude toward women and his female companions, his relationship with his wife, and his patronage of prostitutes. *Id.*[5] While the reasons for each of these inquiries is not immediately apparent, Defendant raised the issue of these particular questions for the first time in his reply brief. Accordingly, the government has had no opportunity to explain the relevance of each area of questioning.[6] In any event, they seem equally irrelevant to Defendant's case in mitigation. As lack of relevance does not establish improper purpose, the court does not view this line of questioning as evidence of grand jury abuse.

The government asserts that it subpoenaed Defendant's personal friends, relatives, employers, colleagues, and acquaintances largely to determine whether he harbored animosity toward racial and religious minorities. Opp., at 13–14. Defendant admits that prosecutors were "entitled to inquire into the racial animus elements of the alleged 'hate crimes.'" Reply, at 5. The grand jury transcript summaries support the government's contention that its interrogation of grand jury witnesses focused on this issue. Any witness who had a prior personal relationship with Defendant was questioned about Defendant's views concerning racial and religious minorities. *See* Def.'s Exh. 4, *passim.* For example, Debbie Mathews' son, Clint Mathews, was questioned about Defendant's involvement with the Aryan Nation, a white supremacist organization. Opp., at 23. Because a Section 245 violation requires that the offender act on account of the victim's race, religion, or national origin, this line of questioning falls within the legitimate scope of the grand jury's investigation.

Defendant's friends, family members, acquaintances, and coworkers also gave testimony to the grand jury regarding whether he was able to form the specific intent required for a Section 245 violation. Specifically, they were asked about Defendant's mental health; his use of prescription medication, illicit drugs, and alcohol; and his ability to behave as "functioning member of society." Defendant objects to these questions as designed to elicit rebuttal evidence for use at the penalty phase of the trial. Mot., at 2; Reply, at 6. The government counters that these questions sought "historical information regarding defendant's ability to act knowingly, deliberately, and purposefully." Opp., at 22. For example, questions concerning defendant's ability to function in social situations were intended to explore "whether defendant acted in a way that suggested that he intended the results of his actions or whether anger, passion, alcohol, or drug

---

5. Defendant was "married" to Debbie Mathews at the Aryan Nation compound in Idaho. Opp., at 20 n. 10. Debbie Mathews was previously married to Robert Mathews, a former leader of the Aryan Nation who allegedly took part in the religiously motivated killing of radio talk show host Alan Berg and was subsequently killed in a shootout with FBI agents. Opp., at 23 n. 12. The government claims that it was entitled to inquire into Defendant's relationship with Debbie Mathews to determine whether she could invoke the marital privilege to avoid testifying before the grand jury. While not conceding that such a privilege was available to Ms. Mathews, the government eventually agreed to release her from her grand jury subpoena. Opp., at 21 n. 11. In light of her connection to the Aryan Nation, her close prior relationship with Defendant, and Defendant's attempts to contact her shortly before and immediately after the shooting, the court must conclude that the government properly sought Debbie Matthews' testimony. Opp., at 24 n. 13.

6. At oral argument, the government adequately explained the reason for inquiring into Defendant's patronage of prostitutes. The relevant inquiry, however, is not whether the government has shown the propriety of every question asked, but whether Defendant has made a colorable showing that the dominant purpose of the inquiries was an improper one. On this record, he has not.

abuse made it unclear whether defendant always intended the consequences of his acts, a litmus test in establishing specific intent." Opp., at 22–23. Clint Mathews testified that Defendant suffered from "panic attacks" that, while physically distressing, did not render him unable to function. *Id.* at 23. This line of questioning was clearly relevant to the grand jury's determination of Defendant's ability to form the criminal intent necessary to warrant the charges ultimately brought. The fact that "witnesses were not [specifically] asked if Mr. Furrow acted knowingly, deliberately or purposefully in prior stressful situations, or while under the influence of alcohol or medications," Reply, at 6, does not raise an inference that the government's stated purpose was pretextual.

Defendant further argues that questions regarding his need for medication in the past sheds little light on Defendant's mental state on August 10, 1999, the date the charged offenses were allegedly committed. Reply, at 6–7. Instead, he claims that such questions sought testimony to rebut Defendant's evidence in mitigation, specifically Defendant's mental illness and need for medication. *Id.* at 7. As noted above, the grand jury is not limited to calling witnesses with knowledge of Defendant's state of mind on August 10, 1999. The Section 245 charges on which Defendant was eventually indicted require that Defendant have acted willfully. In light of the grand jury's duty to find that each element of the charged crimes was supported by probable cause, the court cannot conclude that an inquiry into Defendant's known ability to intend the consequences of his actions while taking medication was improper.

 Furthermore, the grand jury was entitled to hear evidence of Defendant's mental incapacity, as such evidence would clearly would have affected its decision to indict. Because the grand jury's

"mission is to clear the innocent, no less than to bring to trial those who may be guilty," *Dionisio*, 410 U.S. at 16–17, 93 S.Ct. 764, it "may inquire into possible affirmative defenses and the like in order to determine whether a prosecution should proceed." [7] *Port v. Heard*, 594 F.Supp. 1212, 1217 (S.D.Tex.1984) (concluding that no abuse occurred where grand jury investigation inquired into existence of affirmative defenses, such as insanity); *cf. Mandujano*, 425 U.S. at 573, 96 S.Ct. 1768 (The grand jury "function[s] as a shield against arbitrary accusations."); *Branzburg v. Hayes*, 408 U.S. at 688, 92 S.Ct. 2646 (grand jury has a duty "to return only well-founded indictments"). In fact, the Department of Justice directs a prosecutor who "is personally aware of substantial evidence that directly negates guilt . . . [to] present or otherwise disclose such evidence to the grand jury before seeking an indictment. . . ." U.S. Dep't of Justice, *United States, Attorney's Manual* ¶ 9–11.233 (Sept.1997). To discourage the government from presenting such evidence to the grand jury "would be unsound and contrary to public policy." *Port v. Heard*, 594 F.Supp. at 1217. Accordingly, the government was entitled to inquire into the subject of Defendant's mental capacity, even though its questions may have been likely to elicit evidence relevant to sentencing considerations.

"The timing of the subpoena casts significant light on its purposes." *In re Grand Jury Subpoena (Simels)*, 767 F.2d 26, 29 (2d Cir.1985) [hereinafter Simels]. "[A]bsent some indicative sequence of events demonstrating an irregularity, a court has to take at face value the Government's word that the dominant purpose of the Grand Jury proceedings is proper." *Dardi*, 330 F.2d at 335. In *Simels*, the government sought documents relating to the accused's relationship with his attorney by serving a trial subpoena one week after

---

7. In *United States v. Williams,* 504 U.S. 36, 55, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992), the Supreme Court held that courts may not sanction the government for failing to present

exculpatory evidence to the grand jury. It does not follow, however, that presentation of such evidence is improper.

the superseding indictment was filed. In response to opposition from the criminal defense bar, the government stated that "[t]he trial subpoena was served solely for evidentiary purposes." *Id.* at 29. Following deferral of the trial subpoena, the government served on defendant's attorney "a grand jury subpoena seeking the very same materials described in the trial subpoena." *Id.* at 29. The court reasoned:

[While] adjournment of the trial subpoena and the substitution of a grand jury subpoena ... might have represented a laudable attempt to alleviate the concerns raised by Simels and representatives of the organized bar, [there is] no reason to believe that this concession signified a shift in the uses to which the government intended to put the information sought.

*Id.* at 29–30.

Likewise, in *United States v. Kovaleski,* 406 F.Supp. 267 (E.D.Mich.1976), the prosecutor called an unindicted coconspirator to testify before the grand jury in connection with an investigation of potential perjury charges against defendant after the court declared a mistrial and the government stated its intention to persist in its prosecution of defendant. The court, describing the timing of the subpoena as "unusual," found that the government had acted improperly. *Id.* at 270; *cf. United States v. Raphael,* 786 F.Supp. 355, 359 (S.D.N.Y.1992) (government's service of Grand Jury subpoenas on three defense witnesses on Christmas Eve returnable the day after New Year's Day during preparation for a third trial of defendant "appears questionable.").

By contrast, in *United States v. Ruppel,* 666 F.2d 261 (5th Cir.1982), the grand jury questioning at issue occurred after defendant's conviction but before the judge had ordered a new trial. Thus, unlike *Simels* and *Kovaleski,* the sequence of events in *Ruppel* did not suggest an improper purpose. *Id.* at 268.

█ Here, there is no unusual sequence of events to justify an inference of prosecutorial misconduct. The original indictment was filed August 19, 1999. After three and a half months of investigation, the grand jury returned a superseding indictment that included thirteen additional counts. Defendant asserts that the six additional counts based on violations of Section 245 were alleged in the Los Angeles District Attorney's August 11, 1999 complaint, implying that, as of that date, the government had sufficient information to charge Defendant with those offenses.[8] Mot., at 9; Def.'s Exh. 3. However, the state complaint did not require a finding of probable cause by a grand jury. In addition, interference with a federally protected right is not an element of the state charges. Finally, the availability of sufficient evidence to charge certain crimes at an earlier point in the process does not cast doubt on the propriety of the grand jury's investigation, for the grand jury has an affirmative duty to conduct a thorough and deliberate investigation. *See Branzburg v. Hayes,* 408 U.S. at 701, 92 S.Ct. 2646 ("A grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined. . . .").

Even assuming *arguendo* that some of the questions posed to grand jury witnesses were motivated by improper concerns, on the evidence before the court, Defendant has failed to establish that the sole or dominant reason for the grand jury's post-indictment labors was to strengthen the prosecution's case for trial. Here, the government continued to investigate the murder after the initial indictment had been filed, "seeking to identify others potentially involved in the conspira-

---

**8.** Defendant also claims that a flow chart prepared by a government agent shows that all seven weapons charged in the firearms counts of the First Superseding Indictment were discovered on August 10, 1999. Mot., at 8 n. 2. Defendant does not attach that flow chart as an exhibit to its motion or reply papers. Defendant does not contest, however, the government's contention that the grand jury was entitled to attempt to determine who might have aided Defendant, a convicted felon, in obtaining the firearms.

cy, and preparing to file additional charges against [Defendant]." *United States v. Jones,* 129 F.3d 718, 723 (2d Cir.1997) (concluding that continued detention of defendant to aid the investigation did not constitute a constructive arrest). The government's use of the grand jury for these purposes is entirely appropriate. *See Kovaleski,* 406 F.Supp. at 269 ("The pendency of a prosecution does not prevent the government from calling witnesses before a grand jury to investigate the possible commission of other offenses.").

That the post-indictment stage of the grand jury's investigation may have yielded evidence bearing on Defendant's future dangerousness or other factors to be considered at the penalty phase of the trial does not compel a finding of abuse. As noted above, such a finding may not be premised on a showing of incidental benefit to the government. While the government may have obtained information relevant to the capital sentencing factors as "an incidental by-product of the grand jury's investigations, it is clear that pre-trial discovery was not their primary or principal reason for continuing their efforts before the grand jury." *Port v. Heard,* 594 F.Supp. at 1214; *see also Ruppel,* 666 F.2d at 268 (where grand jury summoned witness to aid its continuing investigation of marijuana smuggling, fact that testimony incidentally benefitted government did not justify sanctions for abuse). Here, Defendant has not shown that the grand jury exceeded its admittedly broad investigatory authority. *See Branzburg v. Hayes,* 408 U.S. at 688, 92 S.Ct. 2646 ("Because its task is to inquire into the Existence of possible criminal conduct and to return only well-founded indictments, its investigative powers are necessarily broad."). Accordingly, Defendant has failed to overcome the presumption of regularity accorded grand jury proceedings, or to present colorable evidence of grand jury abuse.

## IV. CONCLUSION

For the reasons set forth above, Defendant's motion for sanctions for abuse of the grand jury is *denied.*

IT IS SO ORDERED.