UNITED STATES of America,
Plaintiff–Appellee,

v.

Frank B. BREITKREUTZ,
Defendant–Appellant.

No. 91–5837.

United States Court of Appeals,
Sixth Circuit.

Argued April 10, 1992.

Decided Sept. 30, 1992.

Steven H. Cook, Asst. U.S. Atty. (argued and briefed), Chattanooga, Tenn., for plaintiff-appellee.

Peter Robinson (argued and briefed), Santa Rosa, Cal., for defendant-appellant.

Before: NELSON and RYAN, Circuit Judges; and FORESTER, District Judge.[*]

RYAN, Circuit Judge.

Defendant Frank B. Breitkreutz was convicted of conspiring to distribute methamphetamine in violation of 21 U.S.C. § 846. On appeal, he assigns error to the district court's denial of his motion to strike the testimony of two witnesses for alleged grand jury abuse. He also assigns error to two evidentiary rulings, one admitting a purported drug ledger as the statement of a coconspirator, and the other admitting a judgment and commitment order of a coconspirator to bolster the credibility of a government witness. Finding no error in the rulings of the district court, we shall affirm the judgment of conviction.

I.

In March 1988, agents of the Drug Enforcement Administration (DEA) and the Tennessee Bureau of Investigation (TBI) searched the residence of Ray and Lisa Loudermilk in Cleveland, Tennessee and discovered a small quantity of methamphetamine. The Loudermilks agreed to cooperate with the government, and helped set up their supplier, Craig Van Riper, in a controlled buy in Pigeon Forge, Tennessee. Van Riper, in turn, led authorities to his supplier, Frank Santiago, who operated out of Athens, Georgia. Santiago then identified Mark Ruff as his source. Ruff, who lived in northern California, told government agents that he had two main sources for methamphetamine: his stepfather, Ferrell Clements, and defendant, Frank Breitkreutz.

As the DEA and TBI began their probe in Tennessee, local authorities in California were already involved in investigating de-

---

[*] The Honorable Karl S. Forester, United States District Judge for the Eastern District of Kentucky, sitting by designation.

fendant, Clements, and others suspected of involvement in methamphetamine distribution in the San Francisco Bay area. As part of their investigation, in January 1988, the San Pablo, California Police Department searched the residence of the defendant and his wife, Janet Breitkreutz. In this search, they located cash, firearms, large quantities of chemicals used to manufacture methamphetamine, a book detailing the manufacture of methamphetamine, receipts for glassware often used to produce methamphetamine, and several sheets of paper containing names, phone numbers, dollar amounts, lists of chemicals, and various calculations and other notations. Authorities also searched another house used by the Breitkreutzes and confiscated more chemicals and glassware used in methamphetamine production and a large number of "baggies," which are often used in drug distribution.

In November 1988, a federal grand jury sitting in Tennessee returned an indictment charging the defendant with participation in a "chain" conspiracy to distribute and possess with intent to distribute methamphetamine. Also named as coconspirators in the indictment were Clements, Ruff, Castle, Santiago, Van Riper, and "other persons known and unknown to the Grand Jury." In a superseding indictment issued in April 1989, Janet Breitkreutz was named as a conspirator as well. Clements, Ruff, and Castle entered into plea agreements, and each later testified before the grand jury as to their involvement in the conspiracy. Defendant, in the meantime, jumped a $100,000 bond issued by a magistrate judge in California in November 1988 and remained a fugitive until his arrest in December 1990.

At defendant's trial, the government called Ruff and Castle as witnesses, and also introduced evidence seized in the January 1988 searches at the Breitkreutzes' residence. According to Ruff's testimony, he and defendant began trafficking in narcotics in the summer of 1987, after Ruff's discharge from the military. Ruff had been receiving relatively small quantities of methamphetamine from his stepfather, and supplying Santiago, an acquaintance from

the army, with the drugs via Federal Express shipments to Georgia. As Santiago expanded his distribution network and the quantities needed by Santiago became larger, Ruff turned to defendant as his primary source for methamphetamine. Ruff said that the switch was necessary because his stepfather was an unreliable source. Ruff testified to having supplied Santiago with approximately 60 pounds of methamphetamine over a period of months. He estimated that about two-thirds of this amount he received from defendant, the rest from his stepfather and from another supplier, Donnie Phillips.

Castle, a childhood friend of Ruff, testified that on a few occasions he acted as a courier of drugs and money. Following the January 1988 search of the Breitkreutz residence in California, the conspirators became more circumspect in their affairs and employed Castle, who had no prior links to the drug trade, to make several trips to Santiago's home in Georgia, once carrying about 20 pounds of methamphetamine and returning to California with $200,000 cash. Castle also testified that on one occasion, at Ruff's direction, he accompanied defendant and Janet Breitkreutz to a hotel at the Stockton, California airport, where he was given a duffel bag, containing about ten pounds of methamphetamine, to deliver to Ruff.

Several documents purported to be drug ledgers, as well as other evidence of methamphetamine trafficking seized in the January 1988 searches of the Breitkreutzes' residences, were admitted into evidence at defendant's trial through the testimony of Detective Doug Hearn of the San Pablo Police Department. With respect to the documents seized, Hearn testified that, based on his experience in narcotics investigations, he interpreted them to be records and notes used to keep track of sales, receipts, and other calculations related to the sale of methamphetamine. He also testified to the seizure of cash, assorted weapons, and equipment and chemicals used to manufacture methamphetamine.

Defendant was convicted following a jury trial and now appeals.

## II.

### A.

During the trial, defendant requested, and was provided, transcripts of the grand jury testimony of witnesses Ruff and Castle under the Jencks Act, 18 U.S.C. § 3500(e)(3). After reviewing the grand jury statements of Ruff and Castle, defendant moved to strike their testimony or, alternatively, to dismiss the indictment for misuse of the grand jury. Defendant asserted that, because he had already been indicted at the time Ruff and Castle testified before the grand jury, the government improperly used the grand jury process to gather evidence against him and to prepare its case for trial, rather than as part of a continuing investigation of the drug conspiracy. *See, e.g., United States v. George,* 444 F.2d 310, 314 (6th Cir.1971). The district court denied the motion, concluding that "this [was] certainly an ongoing investigation [and] I can't say that the Government [was] not proceeding with future, looking toward the future in this case."

■■■ Our standard of review in determining whether an indictment should have been dismissed for misuse of the grand jury is abuse of discretion. *United States v. Overmyer,* 899 F.2d 457, 465 (6th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 344, 112 L.Ed.2d 308 (1990). A court may not interfere with the grand jury's investigation "[s]o long as it is not the sole or dominant purpose of the grand jury to discover facts relating to [a defendant's] pending indictment." *George,* 444 F.2d at 314. The defendant retains the burden of demonstrating that an abuse has occurred, as a "presumption of regularity attaches to a grand jury's proceedings...." *United States v. Woods,* 544 F.2d 242, 250 (6th Cir.1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977).

In this case, defendant asserts that the government sought to "lock in" incriminating testimony from Ruff and Castle prior to their sentencing, allegedly enabling the government to gain greater control over the fate of the witnesses and, thus, the content of their testimony. It is also argued that the timing of the grand jury testimony in the days just prior to the witnesses' sentencing, and the presence of the same prosecutor before the grand jury and at trial, indicate that the government was impermissibly gathering damaging testimony against defendant before the grand jury even though he had already been indicted.

■■■ Defendant's allegations are not supported by any reference to the grand jury testimony, however, and constitute mere speculation. Because witnesses may legitimately be summoned to testify before a grand jury for the purpose of investigating persons who may be involved in a previously investigated conspiracy but who were unknown to the grand jury at the time, a defendant must show that the challenged witnesses were not called to accomplish a proper objective. *United States v. Gibbons,* 607 F.2d 1320, 1328 (10th Cir.1979) (citing *Woods,* 544 F.2d at 250). Yet, in this case, defendant has offered "nothing beyond [his] own unproved suspicions to prove that [the witnesses] were improperly summoned before the grand jury for the sole or dominant purpose of preparing the pending indictment[ ] for trial." *Woods,* 544 F.2d at 250.

■■■ Defendant's assertions of personal opinion as to the contents of the grand jury testimony and the purposes for which Ruff and Castle were called to testify fail to meet his burden of proving irregularity in the grand jury process. For this reason, we cannot conclude that the district court abused its discretion in denying his motion to strike the testimony of Ruff and Castle or, alternatively, to dismiss the indictment for misuse of the grand jury by the government.

### B.

Defendant also challenges the district court's admission into evidence of certain documents the parties have described as drug ledgers. At oral argument, defendant addressed only the admission of Exhibit M–21, and we shall limit our discus-

sion to this exhibit.[1] Exhibit M–21 was seized from Janet Breitkreutz's purse and listed several chemicals, including methylamine, methyl alcohol, acetic anhydrides, sodium acetate, and sodium hydroxide, and certain items of equipment, including vacuum pump, ice vapor trap, and boiling beads, often used to produce methamphetamine. It also contained a list of names and notations as follows:

| Jeanne | 21 |
|---|---|
| Cousin | 22 |
| Corena(2) | 5, 6 |
| Doug(4) | 4, 2, 3, 1 |
| Dino(2) | 15, 16 |
| Debbie(2) | 13, 14 |
| Dave(2) | 8, 9 |
| Joan(2) | 7, 12 |
| James(2) | 10, 11 |
| Larry(2) | X4, X5 |
| Bill(1) | 17 |
| *Mark(2)* | *X2, X1, X7* |
| My friend(2) | X3, X8, 25 |
| My friend Rick(1) | 24 |
| Korena | 19, X6 |

(Emphasis added.) The government offered the ledger as evidence that defendant was involved in a methamphetamine distribution conspiracy. The district court admitted the various documents, explaining that it was

> satisfied by a preponderance of the evidence that there was a conspiracy to manufacture and distribute methamphetamine in existence, and that these documents were made by the Defendant himself, which, of course, make them admissible as an admission, [or] if they were not made by him, they were made by somebody who was ... obviously involved in this conspiracy, because they involve on their face statements regarding business transactions surrounding the methamphetamine deals that we're concerned with here.

■ Since the parties have concentrated most of their attention on the so-called

coconspirator's exclusion to the rule against hearsay, Fed.R.Evid. 801(d)(2)(E), we shall focus on this rule as well. Rule 801(d)(2)(E) states that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay when introduced against the nonoffering party. There are three foundational prerequisites which must be established to admit a coconspirator's statements under Rule 801(d)(2)(E): that a conspiracy existed; that defendant was a member of the conspiracy; and that the declarant's statement was made during the course and in furtherance of the conspiracy. *United States v. Hitow,* 889 F.2d 1573, 1581 (6th Cir.1989) (citing *United States v. Vinson,* 606 F.2d 149, 152 (6th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980)). *See also Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987). These preliminary matters are findings of fact to be made by the district court pursuant to Fed.R.Evid. 104(a). They must be established by a preponderance of the evidence, *Bourjaily,* 483 U.S. at 176, 107 S.Ct. at 2779, and are reviewed only for clear error. *Id.* at 181, 107 S.Ct. at 2781.

■ Defendant contends that the government's failure to identify the author of the ledger renders it inadmissible, relying on *United States v. Mouzin,* 785 F.2d 682 (9th Cir.), *cert. denied,* 479 U.S. 985, 107 S.Ct. 574, 93 L.Ed.2d 577 (1986). In *Mouzin,* the Ninth Circuit examined the admission of an alleged cocaine distribution ledger found in the home of the defendant. The ledger lacked explicit references to cocaine, contained names which the government could not identify at trial, and which could not be linked to defendant by means other than fingerprints. *Id.* at 691–92. The court held that the ledger was not admissible as the statement of a coconspir-

---

1. In his opening statement, defendant conceded having participated in methamphetamine trafficking and claimed throughout trial that, while he was a member of a conspiracy in California, he was not a member of the conspiracy charged in this indictment. A cursory examination of the other documents admitted at trial, containing notes referring generally to drug trafficking but not specifically to the conspirators named in the indictment, makes it apparent that their admission was harmless beyond a reasonable doubt and would not require reversal even if erroneously admitted. Fed.R.Crim.P. 52(a). We therefore concentrate our attention on the admission of Exhibit M–21.

ator under Rule 801(d)(2)(E), declaring that "[k]nowledge of the identity of the declarant is essential to a determination that the declarant is a conspirator whose statements are integral to the activities of the alleged conspiracy." *Id.* at 691–92.

We do not think that the precise identity of a declarant is necessarily required for admission under Rule 801(d)(2)(E) and conclude that, with respect to the admission of Exhibit M–21 in this case, there existed ample circumstantial evidence "that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'during the course of and in furtherance of the conspiracy.'" *Bourjaily*, 483 U.S. at 175, 107 S.Ct. at 2778.

First, we find overwhelming, indeed uncontroverted, evidence that a conspiracy to distribute methamphetamine existed and that defendant was part of it. Defendant has admitted as much repeatedly. Moreover, Exhibit M–21 was found in the purse of defendant's wife during a successful search of the Breitkreutzes' shared residence for evidence of narcotics trafficking, along with vast quantities of chemicals and equipment used to manufacture methamphetamine. Under these circumstances, the district court was not clearly erroneous in finding that these facts were sufficient to support a conclusion, by a preponderance of the evidence, that Janet Breitkreutz, or some other member of a methamphetamine conspiracy, made the statements contained in Exhibit M–21, and that defendant and the declarant were linked to the same drug conspiracy.

Next, the statements contained in Exhibit M–21 themselves, along with the circumstances of their seizure, also allowed the district court to reasonably conclude that the statements were made during the course and in furtherance of the drug conspiracy. The contents of Exhibit M–21 demonstrate a running account of methamphetamine production and distribution, necessary to track various sales and keep the conspirators' drug trade profitable. The document was seized along with other evidence indicating a large-scale methamphet-

amine trafficking operation by the Breitkreutzes. We hold that the district court, under these circumstances, could properly determine, by a preponderance of the evidence, that the statements contained in Exhibit M–21 were made during the course and in furtherance of a drug conspiracy.

Because the government established all the necessary foundational requirements by a preponderance of the evidence, and the district court's findings on these matters were not clearly erroneous, we find no abuse of the district court's discretion in admitting the drug ledger under Rule 801(d)(2)(E). To repeat, the identity of the actual author was not necessary in this case, given the overwhelming circumstantial evidence, essentially undisputed by defendant, that a methamphetamine distribution conspiracy existed, that he was a part of such a conspiracy, and that the statements in Exhibit M–21 were made during the course and in furtherance of a conspiracy to distribute methamphetamine.

■ We are convinced that defendant's argument is really one of relevance. Fed. R.Evid. 402. Defendant conceded at trial that he had entered into and participated in a conspiracy to distribute methamphetamine in California, but argued that he was not a member of the particular conspiracy charged in this case. He asserts that, based on this characterization of the evidence, the government failed to adequately link the ledger to the "Tennessee" conspiracy charged in the superseding indictment and that it was therefore inadmissible as a coconspirator's statement. We interpret defendant's argument in this respect as a challenge to the relevance of the ledger. Ordinarily, determinations of relevance are left to the broad discretion of the district court. *United States v. Hurst*, 951 F.2d 1490, 1503 (6th Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1952, 118 L.Ed.2d 556 (1992). We think that Exhibit M–21 was evidence that had some tendency "to make the existence of [a] fact of consequence [*i.e.*, whether defendant was part of a methamphetamine distribution conspiracy] more probable ... than it would be without the evidence." Fed.R.Evid. 401. Exhibit

M–21, as a bookkeeping record of drug trafficking activity, found in defendant's wife's possession, along with other overwhelming evidence of a methamphetamine distribution conspiracy, was simply "another brick in the wall" of evidence that comprised the government's case. Having determined that the drug ledger was relevant, the only remaining question is the weight to be afforded this evidence. This question, however, is left for the jury's determination.

The government also illustrates that defendant "opened the door" to the admission of Exhibit M–21 in opening statements. Defense counsel stated:

> In all of those searches, and these are searches, believe me, that Mr. Breitkreutz was not expecting, they found not one shred of evidence indicating that he was supplying Mark Ruff or any of these other people.

> They did find some records of people he was supplying. There was [sic] some names and figures there. Not one of them related to Mark Ruff or any of the people in this chain.

We think defendant's invitation to the government to establish some demonstrative evidence linking him to the charged coconspirators, especially Ruff, lends additional support to the district court's decision to admit Exhibit M–21.

### C.

Defendant's final assignment of error relates to the district court's admission of the judgment and commitment order of Ferrell Clements, an alleged coconspirator and witness Ruff's stepfather.

The judgment and commitment order was introduced at trial by the government for the ostensible purpose of countering defense counsel's suggestion that Ruff had implicated defendant in order to assist his stepfather and limit the amounts of methamphetamine attributable to Clements for sentencing purposes. The government sought, by introducing the document, to establish that Clements had been sentenced on June 16, 1989, prior to Ruff's testimony to the grand jury, and that Clements had received a twenty-year sentence, the statutory maximum. Defense counsel at first did not object "to the timing of the sentence coming in," but argued that "the actual sentence that Ferrell Clements received is irrelevant." Counsel objected later, however, on grounds of hearsay and argued that the judgment and commitment order was not admissible under Fed.R.Evid. 803(22).[2] The government argued that Rule 803(22) was not relevant because the order was not being offered "to prove any fact essential to sustain the judgment," but only to show the date and length of the sentence, and sought admission of the document as a properly authenticated "business record of the court." The district court admitted Clements' judgment and commitment order, holding that because the government was not using it to prove a fact essential to the conviction, but merely to counter defendant's attack on Ruff's motives and credibility, Rule 803(22) was not applicable, and the order was admissible.

On appeal, defendant continues to assert that Rule 803(22) does not permit the admission of the judgment and commitment order because it was a judgment of a person other than the accused, offered by the government in a criminal case, for purposes other than impeachment of the witness. The government argues that Rule 803(22) is not applicable where the judgment is not offered to prove facts essential to sustain the judgment and that the document is admissible as a public record under Fed.R.Evid. 803(8).[3]

---

**2.** In pertinent part, Rule 803(22) provides:

Evidence of a final judgment, entered after a trial or upon a plea of guilty (but not upon a plea of nolo contendere), adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year, [is admissible] to prove any fact essential to sustain the judgment, but not including, when offered by the Government in a criminal prosecution for *purposes other than impeachment, judgments* against persons other than the accused....

**3.** Rule 803(8) permits a trial court to admit:

Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pur-

As with all questions of law, we review *de novo* a district court's construction of the Federal Rules of Evidence. *See United States v. Blakeney*, 942 F.2d 1001, 1020 (6th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992).

We agree with government that Rule 803(22) is not applicable where the judgment of previous conviction of a person other than the accused is not offered to prove a fact essential to sustain the judgment. While "[w]e have found no case, and the Government has not cited one, in which a conviction other than that of the witness himself was properly admitted on the issue of his credibility," *United States v. Austin*, 786 F.2d 986, 992 (10th Cir.1986), this would appear to present just such a situation. In *United States v. Wilson*, 690 F.2d 1267, 1275 n. 2 (9th Cir.1982), the court upheld the admission, as a public record, of a properly authenticated judgment and commitment order to establish that the defendant had been incarcerated at the time of the alleged escape. Although Rule 803(22) was also inapplicable in *Wilson* because the judgment and commitment order related to a misdemeanor, rather than a felony, and established the previous conviction of the defendant himself, not a person other than the accused, we can find no meaningful distinction between the cases with respect to the admission of such orders as public records where introduced to prove facts such as dates or the length of a criminal sentence.[4]

Moreover, even if the judgment and commitment had been improperly admitted, defendant fails to establish any prejudice affecting his substantial rights, and we would therefore decline to reverse the judgment or order a new trial under Fed.R.Crim.P. 52(a). In arguing prejudice, defendant contends that the admission of the conviction unfairly established for the jury that a nontestifying coconspirator had already pled guilty and improperly bolstered Ruff's credibility, going to "the heart of the credibility of the appellant's chief accuser and his motive to accuse appellant to protect his own father." At trial, however, defense counsel stated that he had no objection to the timing of the sentence coming in and argued only that the actual sentence received was irrelevant. Further, the fact that coconspirators had pled guilty was already presented to the jury, without objection, through the testimony of Castle and Ruff. Indeed, defense counsel himself elicited from Ruff the fact that Clements was already in prison.

It appears then, that the government did not use the fact that Clements had pleaded guilty as substantive evidence of defendant's guilt. *See, e.g., United States v. Vandetti*, 623 F.2d 1144, 1148 (6th Cir. 1980). Moreover, the facts for which the order was admitted were hardly central to this case. We think the admission of the judgment and commitment order for purposes of establishing the date and length of Clements' sentence was entirely proper and resulted in no unfair prejudice to the defendant.

### III.

We find no merit in the defendant's various assignments of error and therefore AFFIRM the judgment of the district court.

---

suant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate a lack of trustworthiness.

4. We need not reach the issue of whether felony convictions of persons other than the accused are admissible in criminal cases as public records whenever they are not offered by the government to prove facts essential to sustain the judgment.