47 F.3d 1172
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Eleno TORRES, Defendant-Appellant.
 No. 94-1113.
 United States Court of Appeals, Sixth Circuit.
 Jan. 4, 1995.
 
 Before: KEITH, JONES, and MILBURN, Circuit Judges.
 MILBURN, Circuit Judge.
 
 
 1
 Defendant Eleno Torres appeals his jury convictions of one count of conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. Secs. 846 and 841(a)(1) and one count of conspiracy to commit money laundering in violation of 18 U.S.C. Secs. 371 and 1956(a)(1)(A)(i) as well as the sentences imposed thereon. On appeal, the issues are (1) whether the district court erred pursuant to 28 U.S.C. Sec. 1827 in not providing an interpreter to defendant, (2) whether the district court erred in admitting the statements of defendant's coconspirators under Federal Rules of Evidence 801(d)(2)(A) or (E), (3) whether the district court's finding of a base offense level of 32 for defendant under the United States Sentencing Guidelines ("U.S.S.G.") was clearly erroneous, and (4) whether the district court erred in enhancing defendant's base offense level by 4 levels under U.S.S.G. Sec. 3B1.1 for being a leader or organizer of the conspiracy. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 On February 3, 1993, a federal grand jury issued a two count indictment charging defendant, and several co-defendants, with conspiracy to possess with intent to distribute and to distribute marijuana (Count One) in violation of 21 U.S.C. Secs. 846 and 841(a)(1), and with conspiracy to commit money laundering (Count Two) in violation of 18 U.S.C. Secs. 371 and 1956(a)(1)(A)(i). On February 22, 1993, defendant, who was represented by counsel, was arraigned before a United States Magistrate Judge. Defendant stood mute and a plea of not guilty was entered on his behalf by the court. The arraignment was conducted in English and no interpreter was present. Defendant responded to the questions asked by the magistrate judge and showed no apparent problems in understanding the English language. J.A. 65-89.
 
 
 3
 On August 30, 1993, a jury trial of the charges against defendant and several of his co-defendants, namely, Jovita Torres, defendant's wife; William Stevenson; Leon Davenport; and Norma Sanchez, began.[1] During the second day of trial, August 31, 1993, defendant requested an interpreter. Defendant's request was granted and interpreters appeared at trial.
 
 
 4
 Various witnesses testified for the government at the trial. Trooper Michael Cooper of the Missouri State Highway Patrol testified that on May 11, 1988, he stopped a motor home in Laclede County, Missouri, because the driver failed to signal when he was making a turn. There were three persons in the motor home: Pete Barela, Eugenio Casias, and Olga Falcon. Trooper Cooper testified that as a result of a search of the motor home, he found $94,424 and a quantity of marijuana.
 
 
 5
 Pete Barela testified that he was arrested in May 1988, in Lebanon, Missouri, while driving a 1988 Chevrolet motor home at the request of his cousin, Lee Herrera. Barela testified that after the motor home was stopped by the police, the police found three pounds of marijuana and $94,000 in the vehicle. Barela testified that as a result of being stopped and arrested, he pled guilty to criminal charges against him and was sentenced to 52 months' imprisonment.
 
 
 6
 Barela also testified that he drove the motor home from San Antonio, Texas, to Pontiac, Michigan, and was returning from Michigan to Texas at the time of his arrest. In this connection Barela testified that he had driven the motor home to Holland, Michigan, where he picked up Olga Chapa and Eleno Hernandez. Barela identified defendant as the person known to him as Eleno Hernandez. Finally, Barela testified that in April 1988, Librado[2] Herrera sent him $1,000 to keep up the motor home, and, in June 1988, Herrera sent him $1350 after he asked Herrera for money for attorney fees.
 
 
 7
 Lee Herrera also testified at trial. Herrera testified that he pled guilty to criminal charges pursuant to a plea agreement with the government and was sentenced to 14 years' imprisonment. Herrera testified that he had been trafficking in marijuana since 1980. Herrera identified defendant, as well as co-defendants William Stephenson, Leon Davenport, and Jovita Torres as persons who were known to him. Herrera stated that he used to "work" with defendant selling marijuana, and he and defendant used to deliver marijuana to Stevenson and Davenport.
 
 
 8
 Herrera further testified that his cousin, Pete Barela, once drove a motor home for him. Herrera stated that he and defendant gave money to Olga Chapa in Holland, Michigan, because they owed her money from drugs.
 
 
 9
 Herrera also identified several notebooks in which he made records concerning drug transactions and testified that in the notebooks he recorded pounds of marijuana and amounts of money that were owed. Herrera stated that the notebooks contained records of dealings with defendant, Stephenson, and Davenport. Herrera admitted that he never recorded dates in the notebooks, but he stated that the records went back in time about four years prior to the time they were seized from his home as the result of a search warrant, which was in January 1992. Herrera went through the notebooks and testified that the initials "ET" next to various entries in the records stood for Eleno Torres. Herrera also testified that two of the notebooks were identical; he kept one for himself and one for defendant.
 
 
 10
 Herrera also admitted that defendant was not present when he made any of the records. However, Herrera testified that he showed the records of the drug transactions to defendant because they were partners. Herrera also admitted that one of the notebooks had not been prepared by him. Herrera testified, however, that the entries in the notebook were prepared at his direction, and he observed the individual who made the entries as they were being made in the notebook.
 
 
 11
 Herrera testified that he maintained the various records concerning the drug transactions to show defendant that he was not stealing from him. Herrera stated that as the result of bad or low quality marijuana or marijuana containing stems and stalks, he and defendant had lost about $125,000 during the course of their transactions, and, as a result, defendant had occasionally accused Herrera of stealing from him.
 
 
 12
 In addition, Herrera testified that defendant was the person responsible for obtaining the marijuana, and he was responsible for selling it. Herrera testified that he and defendant shared the expenses of obtaining and selling the marijuana. Among the expenses identified by Herrera were the costs associated with using a vehicle and paying people to transport the marijuana. Herrera stated that he and defendant paid drivers to take the marijuana from Holland, Michigan, to Detroit, Michigan, where it was distributed.
 
 
 13
 Furthermore, Herrera testified that on one occasion, sometime in the fall of 1987, he accompanied defendant on a trip to pick up marijuana and that he and defendant obtained about 50 or 60 pounds at a party store in a little town. Herrera stated that he observed the marijuana himself and that he took the marijuana to Detroit. However, he had to return about 40 pounds of the marijuana because it was no good; namely, "you didn't get a high on it." J.A. 220.
 
 
 14
 Herrera also testified that he met with defendant at a car wash in Holland, Michigan, where they obtained approximately 60 pounds of marijuana. Herrera also stated that he and defendant took the marijuana to Detroit, that he smoked some of the marijuana and that it was of good quality.
 
 
 15
 Herrera testified that he and defendant hired Silvia Garcia as a driver and that defendant was present during the discussions with Silvia Garcia. Herrera stated that Silvia Garcia agreed to drive marijuana from Texas to Detroit for defendant and him. Herrera further testified that after he and defendant loaded approximately 160 pounds of marijuana into Silvia Garcia's car, which occurred in Texas, she and her two passengers, Gracie Garcia and Donald Herrera, his cousin, were caught at a police checkpoint, arrested, and taken to jail. Herrera testified that he and defendant were asked to post their bonds to obtain their release from jail.
 
 
 16
 Herrera testified that he was present when defendant took the call from the bondsman informing them that Silvia Garcia, Gracie Garcia, and Donald Herrera had been arrested. Herrera stated that he and defendant discussed the situation and agreed that they would post the bonds. Herrera travelled to Michigan to obtain the money to post the bonds and he then returned to Texas and gave the money to Mrs. Lupe Alvarez to post the bonds. Herrera stated that he was present when Mrs. Alvarez to post the bonds, and he received the receipts from her. Herrera stated that the receipts for the bonds were present at his home when they were seized by the police during the execution of a search warrant in January 1992. Herrera stated that he kept the receipts to show his partner, defendant Torres, that he had posted the bonds, because the money he used to pay for the bonds was, in part, defendant's money. Finally, on cross-examination, Herrera admitted that he had been a long-term user of marijuana, that he had a hard time remembering names, and that he had an awful memory.
 
 
 17
 Bernard Soltis also testified at trial. Soltis testified that his "third" drug transaction occurred at a house in Pontiac, Michigan, where he received 22 or 23 pounds of marijuana. Soltis stated that Lee Herrera and defendant were present at this "third" transaction. Soltis further stated that he was introduced to defendant and knew defendant as Vorale, and at trial, Soltis positively identified defendant as the person he knew as Vorale. Soltis testified that a "fourth" drug transaction also took place in which he received approximately 25 pounds of marijuana at Lee Herrera's house and that Herrera was the only other person present at that time. Soltis testified that he made payments to Orlando Herrera for the marijuana and stated that Herrera's son, Lee Herrera, Jr., told him that "they" would take back all the stems, seeds and stalks from the marijuana which he had purchased.
 
 
 18
 Further, Soltis testified that he discussed payments for the marijuana with both Lee Herrera and defendant. Soltis stated that on one occasion when he complained about "wet" marijuana, Herrera and defendant had a discussion in Spanish, which he did not understand, but they gave him credit off the price of the marijuana. Soltis stated that Lee Herrera would make notations concerning payments for the marijuana in little spiral notebooks and that during discussions concerning money, Herrera would open one of the notebooks, point to a notation, and tell Soltis that he owed that amount of money.
 
 
 19
 Additionally, Soltis testified that Herrera told him that he was obtaining the marijuana from Vorale. Soltis stated that he and Herrera quit working together because of disputes over the amount of money Soltis owed to Herrera for the marijuana he had received.
 
 
 20
 Trooper Barry Washington of the Texas Highway Patrol testified that his duties with the Texas Highway Patrol involved rural traffic law enforcement. Trooper Washington testified that on January 11, 1989, he made a traffic stop of a blue 1982 Dodge van because the van was speeding. Donald Ray Beall was the driver of the van.
 
 
 21
 Trooper Washington testified that he approached the van while it was stopped and asked the driver for a license. The driver was unable to produce a license; however, while Trooper Washington stood at the open door of the vehicle, he was able to detect the odor of marijuana. Trooper Washington arrested Beall, and a search of the vehicle following the arrest resulted in the discovery of approximately 213 pounds of marijuana. The marijuana had been wrapped in clear cellophane packages and hidden in the walls of the van.
 
 
 22
 Beall testified at the trial that he had pleaded guilty to charges of marijuana possession in Texas, which stemmed from his arrest on January 11, 1989, when he was driving the blue 1982 Dodge van which he had obtained from Lee Herrera. Beall stated that he knew there was marijuana in the van because Herrera had told him there was. Beall further stated that he traveled from Michigan to Texas at Herrera's request to pick up a load of marijuana and that Herrera told him the marijuana was to be sold.
 
 
 23
 Beall also testified that Herrera was storing marijuana in the garage of his wife's home, and that Herrera paid him to watch the marijuana occurred "[a] couple dozen times." J.A. 288. Beall also stated that he had helped Herrera carry bundles of marijuana into the garage.
 
 
 24
 In addition, Beall testified that he had helped Herrera deliver marijuana. Specifically, Beall could recall five deliveries of marijuana to co-defendant Stephenson, and he witnessed an exchange of money between Stephenson and Herrera on two of those occasions. Beall testified that when Herrera received money, he saw Herrera make entries in little spiral notebooks. Beall stated that he dealt with Herrera from the spring of 1988 until the summer of 1989 and that the largest amount of marijuana he saw Herrera with at one time was about 200 pounds.
 
 
 25
 Beall testified that he met defendant in the spring of 1988. Beall stated that he saw defendant in the presence of the marijuana at the home of Herrera's wife. Beall also stated that defendant and Herrera would show up together. On one occasion, Beall saw defendant back a car up to the garage at the home of Herrera's wife and load it with marijuana. Beall stated that he also knew defendant as Vorale.
 
 
 26
 Beall testified that on one occasion, sometime in the fall of 1988, he accompanied Herrera to Texas to deliver $27,000 to defendant because some individuals to whom defendant owed money were threatening him. Beall stated that Herrera was taking money to defendant because they were partners, and he often heard Herrera refer to defendant as his "compadre" in Spanish. J.A. 319.
 
 
 27
 Agent John Conlin of the United States Border Patrol in Texas testified at the trial that part of his duties involved working at a checkpoint in Sareta, Texas, which is approximately 60 miles north of the U.S./Mexican border. Agent Conlin stated that on March 25, 1987, he stopped a vehicle with Kansas license tag #400952 at the Sareta checkpoint and that approximately 173 pounds of marijuana were recovered as the result of stopping the vehicle.
 
 
 28
 A Mr. Renchly testified at the trial that on March 23, 1987, an 11-foot U-Haul truck, Kansas license tag #400952 was rented. The rental contract indicated that defendant was the individual who rented the vehicle.
 
 
 29
 At the close of the government's case on September 9, 1993, defendant's wife and co-defendant, Jovita Torres, moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. The district court granted the motion and the charges against Jovita Torres were dismissed.
 
 
 30
 The following day the jury found defendant guilty of the charges in counts one and two of the indictment. However, the jury acquitted William Stevenson and Leon Davenport of the charges against them. On January 18, 1994, defendant was sentenced to 235 months' imprisonment on count one and 60 months' imprisonment on count two, with the sentences to be served concurrently, and five years' supervised release on count one and three years' supervised release on count two, with the terms of supervised release also to run concurrently.[3] This timely appeal followed.
 
 II.
 A.
 
 31
 Defendant argues that the trial court's failure to provide him with an interpreter pursuant to 28 U.S.C. Sec. 1827 deprived him of a fundamentally fair trial. The record shows that on the second day of trial, August 31, 1993, the following exchange took place between the court and defense counsel, Mr. Greydanus:
 
 
 32
 MR. GREYDANUS: ... Without really indicating specifically whether my client will testify at this time, it's been brought to my attention for the first time that he feels some difficulty in communicating, and apparently he's had difficulty in communicating with me. He would like to have an interpreter if he is put on the stand, if he is going to testify.
 
 
 33
 THE COURT: Well, I asked your client when he was here before--and you--whether he could speak English. And it was told to me that he could. What's your impression of that?
 
 
 34
 MR. GREYDANUS: Well, he has spoken English to me.
 
 
 35
 THE COURT: Can he understand English?
 
 
 36
 MR. GREYDANUS: I was told this morning that he fells very uncomfortable in receiving questions; if he is going to testify, that he is not going to be able to understand them correctly.
 
 
 37
 THE COURT: All right. We'll see if he's going to testify. You're just saying if he testifies, that is the case?
 
 
 38
 MR. GREYDANUS: That he is requesting a Spanish translator.
 
 
 39
 * * *
 
 
 40
 MS. SHEKMER: Your Honor, if I might address the Court. I'm concerned that if Mr. Torres believes that he needs an interpreter if he takes the stand, there may be a question on the appellate level whether or not he understood the proceedings occurring before us now. I don't have any doubt that he does personally, but I think it raises that issue.
 
 
 41
 THE COURT: I asked Mr. Torres, my recollection is, at a prior hearing whether he could understand English, and he said--Can you understand English?
 
 
 42
 THE DEFENDANT: Not--if they use bigger words than I'm used to, talk a--I'm not going to be able to see what they mean. We've got people that are--what is--with a Master's Degree and stuff like that. They use big words, and I don't understand all of them. Sometimes I don't understand what they mean. If they talk just plain language all the time, I do understand.
 
 
 43
 THE COURT: All right.
 
 
 44
 J.A. 10-11. The record reflects that defendant made his request for an interpreter at approximately 10:04 a.m. and that the interpreter was sworn in at approximately 11:23 a.m., providing a continuous interpretation of the trial thereafter. The record also reflects that between the time of defendant's request for an interpreter and the time an interpreter was sworn in, the parties made their opening statements and one witness had begun to testify. In addition, the first day of trial had occurred, during which time the jury was selected.
 
 
 45
 Defendant asserts that the lack of continuous interpretation deprived him of a fundamentally fair trial. He further asserts that he may have been denied the right [to participate in the selection of the jury] because of language difficulties. Lastly, defendant asserts that he "may not have realized the difficulties he would encounter until the trial began" and that "[h]is problem with communicating may have kept him from bringing it to the Court's attention earlier." Consequently, defendant argues that "[i]n order to remove any possible taint in the proceedings, [he] should be granted a new trial." Brief of Appellant at 6.
 
 
 46
 The Court Interpreters Act, 28 U.S.C. Sec. 1827, provides in relevant part:
 
 
 47
 (d)(1) The presiding judicial officer, with the assistance of the Director of the Administrative Office of the United States Courts, shall utilize the services of the most available certified interpreter, or when no certified interpreter is reasonably available, as determined by the presiding judicial officer, the services of an otherwise qualified interpreter, in judicial proceedings instituted by the United States, if the presiding judicial officer determines on such officer's own motion or on the motion of a party that such party (including a defendant in a criminal case), or a witness who may present testimony in such judicial proceedings--(A) speaks only or primarily a language other than the English language; ... so as to inhibit such party's comprehension of the proceedings or communication with counsel or the presiding judicial officer, or so as to inhibit such witness' comprehension of questions and the presentation of such testimony.
 
 
 48
 This court's "inquiry as to a district court's decision concerning the appropriate use of interpreters in the courtroom focuses upon whether the purposes of the Act were adequately met." United States v. Sanchez, 928 F.2d 1450, 1454 (6th Cir.1991). "The purposes of the Act are to ensure that a party has comprehension of the proceedings and to provide the means to communicate effectively with counsel." Id. (quoting United States v. Tapia, 631 F.2d 1207, 1210 (5th Cir.1980)).
 
 
 49
 The ultimate question in considering a claim of inadequate interpretation is " 'whether such failure made the trial fundamentally unfair.' " As long as the purposes of the Act have been met, the appropriate use of interpreters in the courtroom is a matter within the sound discretion of the district court." Id. (citations omitted) Moreover, "[b]ecause the proper handling of translation hinges on a variety of factors, including the defendant's knowledge of English and the complexity of the proceedings and testimony, the trial judge, who is in direct contact with the defendant, must be given wide discretion." Valladares v. United States, 871 F.2d 1564, 1566 (6th Cir.1989) (citing United States v. Coronel-Quintana, 752 F.2d 1284, 1291 (8th Cir.), cert. denied, 474 U.S. 819 (1985)).
 
 
 50
 However, Sec. 1827 does not place a mandatory duty on the trial court to inquire as to the need for an interpreter when a defendant has difficulty with English. Valladares v. United States, 871 F.2d at 1565. Rather, where continuous interpretation has not been provided, "a reviewing court must determine 'whether the purposes of the Act were adequately met.' " Id. (quoting United States v. Lim, 794 F.2d 469, 470 (9th Cir.), cert. denied, 479 U.S. 937 (1986)).
 
 
 51
 In this case, the district court did not abuse its discretion because the purposes of the Court Interpreters Act were adequately met. First, although continuous interpretation was not provided, the district court went beyond defendant's request for an interpreter. Defendant requested an interpreter if he should decide to testify. However, the district court provided continuous interpretation beginning shortly after defendant made his request for an interpreter.
 
 
 52
 More importantly, defendant did not even request an interpreter until after the commencement of the proceedings on the second day of his trial. Furthermore, defendant did not object to the absence of an interpreter prior to the time he requested an interpreter, and the record does not reflect that the defendant made any objection to the resumption of the trial during the short period between the time he requested a Spanish-English interpreter should he testify and the time the court was able to actually procure an interpreter.
 
 
 53
 Furthermore, at his arraignment, defendant told the magistrate judge that he understood English, and he responded appropriately in English to inquiries from the magistrate judge. Lastly, at trial, at least prior to his request for an interpreter, defendant appeared to understand English since he responded in English to questions put to him by the court.
 
 
 54
 Therefore, under the circumstances of this case, we conclude that defendant was not deprived of a fundamentally fair trial by the lack of continuous interpretation during his trial.
 
 B.
 
 55
 Defendant argues that the district court erred in allowing various hearsay statements, particularly Lee Herrera's notebooks or ledgers, to be admitted pursuant to Federal Rule of Evidence 801(d)(2)(E).[4] Defendant asserts that the government failed to prove by a preponderance of the evidence that defendant was a member of the conspiracy to distribute marijuana. Defendant also asserts that because Herrera admitted that he was a chronic user of marijuana, his testimony linking defendant to the conspiracy was not credible.
 
 
 56
 In ruling on the admissibility of coconspirator statements, the district court stated:
 
 
 57
 For purposes of the trial, I find that the testimony [and] documents by and between, among and from the named and unnamed conspirators sets forth a criminal agreement for the delivery and sale of controlled substances, specifically marijuana, and that a conspiracy has been shown. The documents and statements were provided or made by the conspirators in furtherance of the conspiracy--during the course of the conspiracy and in furtherance of the conspiracy.
 
 
 58
 And, therefore, the documents submitted by the government will be admitted into evidence. This finding is made in the totality of the record, and the standard that I used was a preponderance of the evidence.
 
 
 59
 Tr. 1146 (quoted in Brief of Appellant at 17). The district judge subsequently added that when he "said documents and statements, [he] meant the exhibits as well." Id. The court also made a similar finding concerning a hearsay statement by Eugenio Casias; namely, that Mr. Herrera told him the money in the motor home he was driving was for drugs. J.A. 262. The district court stated:
 
 
 60
 And I do find based on the testimony of Mr. Herrera that there was a conspiracy in existence, that the declarant, Mr. Herrera was a member of that conspiracy because he said he was. He asked Mr. Casias to do this, which was Mr. Casias's statement. The defendant against whom the statement was offered was a member of the conspiracy. I find by a preponderance of evidence ... that there is sufficient evidence....
 
 
 61
 The statement was made in furtherance of the conspiracy because it goes to the transfer of the money that was for the drugs. And the statement made during the course of that conspiracy was certainly before Mr. Casias was caught and prior to the time that Mr. Casias was transferring the money for the drugs. So I think that that statement by Mr. Casias is admissible.
 
 
 62
 J.A. 264-65.
 
 
 63
 There are three prerequisites for admissibility of a coconspirator's statement under Rule 801(d)(2)(E): (1) that a conspiracy existed, (2) that the defendant was a member of the conspiracy, and (3) that the statement of the declarant was made during the course of and in furtherance of the conspiracy. United States v. Enright, 579 F.2d 980, 986 (6th Cir.1978); United States v. Breitkreutz, 977 F.2d 214, 218 (6th Cir.1992). Such "preliminary matters are findings of fact to be made by the district court." Breitkreutz, 977 F.2d at 218. Furthermore, the three prerequisites must be established by a preponderance of the evidence, and this court reviews a district court's finding that the three prerequisites have been satisfied "only for clear error." Id. However, the district court's ultimate legal conclusion is subject to de novo review. United States v. Carter, 14 F.3d 1150, 1155 (6th Cir.), cert. denied, 115 S.Ct. 156 (1994).
 
 
 64
 Moreover, in making its preliminary findings as to the admissibility of conconspirator statements, the district court may consider the contents of the statements themselves in deciding that the statements are admissible. Id.; see also Bourjaily v. United States, 483 U.S. 171, 177-78 (1987). In addition, a statement is "made in furtherance of a conspiracy if it was intended to promote conspiratorial objectives; it need not actually further the conspiracy." Carter, 14 F.3d at 1155 (citing United States v. Hitow, 899 F.2d 1573, 1581 (6th Cir.1989)). Furthermore, in deciding whether coconspirator statements are admissible, it is permissible for the district court to proceed as it did in this case; namely, to "admit the hearsay statements subject to a later demonstration of their admissibility by a preponderance of the evidence." United States v. Holloway, 731 F.2d 378, 381 (6th Cir.1984) (citing United States v. Vinson, 606 F.2d 149, 153 (6th Cir.1979), cert. denied, 444 U.S. 1074 (1980)).
 
 
 65
 In this case, the district court's findings that the three prerequisites for admissibility of the evidence under Rule 801(d)(2)(E) were established by a preponderance of the evidence are not clearly erroneous. There was ample evidence that a conspiracy existed and defendant was a member of the conspiracy. Further, the evidence showed that the statements of the declarant, Lee Herrera, were in furtherance of the conspiracy. In particular, Herrera prepared the notebooks or ledgers to further the conspiracy by seeking to settle or avoid disputes between himself and defendant concerning moneys due and owing from the procurement and distribution of the marijuana.
 
 
 66
 Moreover, although the district court may have relied on Lee Herrera's testimony in finding the coconspirator statements admissible, the district court's reliance was not misplaced. First, the district judge was able to observe Herrera's testimony, particularly his demeanor on the witness stand. Second, Herrera's credibility was supported by other evidence, including the testimony of other witnesses, the notebooks or ledgers themselves, and by Herrera's guilty plea, in the same district court, to charges arising out of the conspiracy to distribute marijuana. Therefore, the district court did not err in admitting the conconspirator statements under Rule 801(d)(2)(E).
 
 C.
 
 67
 Defendant argues that the district court erred in enhancing his offense level by four levels for his role in the offense under U.S.S.G. Sec. 3B1.1(a). Specifically, defendant asserts that the district court's finding that he was a leader or organizer of the conspiracy under U.S.S.G. Sec. 3B1.1 was clearly erroneous. Defendant asserts that the district court's determination was clearly erroneous because it relies, in part, upon the testimony of Lee Herrera, which the defendant claims was not credible.
 
 
 68
 In applying the four level upward adjustment, the district court stated:
 
 
 69
 Mr. Herrera testified as to a long-term conspiracy and business of drug dealing with Mr. Torres. He said that he was a partner of Mr. Torres. He said that he and Mr. Torres split the profits. He said that he kept two sets of books, one for himself and one for Mr. Torres.
 
 
 70
 * * *
 
 
 71
 But I do credit Mr. Herrera's testimony as to the extent of the conspiracy and as to Mr. Torres' role in the conspiracy. I find that particular part of his testimony to be credible; although, it's hard to say that Mr. Herrera is credible in every detail.
 
 
 72
 ............................................................
 
 
 73
 ....................
 
 
 74
 * * *
 
 
 75
 And it's not just Mr. Herrera's testimony, of course. But, as on most important details, Mr. Herrera's testimony was supported by testimony of others, not specifically as to a specific amount, perhaps, but as to a regular course of business between Mr. Herrera and Mr. Torres.
 
 
 76
 * * *
 
 
 77
 Obviously, there were more than five people involved in the criminal activity here. I had about eight or nine names written down one time ... I believe that there was sufficient evidence [to show that defendant was an organizer or leader of the criminal activity] for the reasons already stated and the fact that Mr. Herrera testified, and I do believe that Mr. Torres was his partner. They solicited drivers. They split profits. His rental of the vehicle; his getting bond to help people after discussion with Mr. Herrera; the two sets of records, once again, one for Mr. Herrera, one for Mr. Torres; Mr. Torres' insistence on being paid; Mr. Torres' association with Mr. Herrera when the $2,000 was delivered, and other evidence that's in the record. That, in my mind, leads to a conclusion that Mr. Torres was an organizer or leader of the criminal activity for which he was convicted.
 
 
 78
 Sentencing tr., pp. 71-72, 75.
 
 
 79
 U.S.S.G. Sec. 3B1.1(a) provides that "[i]f a defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," the defendant's offense level should be increased by 4 levels for his role in the offense. The commentary to U.S.S.G. Sec. 3B1.1(a) provides that "[f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. Sec. 3B1.1, comment. (n. 4).
 
 
 80
 The prosecution has the burden of proving a defendant's status as organizer or leader by a preponderance of the evidence. United States v. Gonzales, 929 F.2d 213, 216 (6th Cir.1991). Furthermore, adjustments to a defendant's offense level under Sec. 3B1.1(a) for his role in the offense are factual determinations, which we review under the clearly erroneous standard, giving due deference to the district court's assessment of the credibility of the witnesses. United States v. Richardson, 939 F.2d 135, 138 (4th Cir.1991), cert. denied, 112 S.Ct. 942 (1992); United States v. Barrett, 890 F.2d 855, 867 (6th Cir.1989).
 
 
 81
 In this case, the district court's finding that defendant was an organizer or leader in the marijuana distribution conspiracy is not clearly erroneous. The evidence at trial, particularly the testimony of Lee Herrera, established that defendant was involved in all aspects of the marijuana distribution conspiracy, especially obtaining the marijuana which was then shipped from Texas to Michigan for distribution in Detroit. Most importantly, Herrera testified that he and defendant were partners in the marijuana distribution conspiracy and that he kept two sets of books containing the financial records of the conspiracy--one for himself and one for defendant. Moreover, although the district court primarily relied on Herrera's testimony as the basis for its finding that defendant was an organizer or leader in the marijuana distribution conspiracy, the district court had the opportunity to observe Herrera during his testimony and the trial judge concluded that Herrera was a credible witness at least with regard to defendant's role in the conspiracy. Furthermore, Herrera's testimony was buttressed by the other evidence at trial. Finally, defendant does not challenge the district court's finding that five or more persons were involved in the conspiracy to distribute marijuana. Accordingly, we conclude that the district court's four level upward adjustment to defendant's offense level for his role in the offense was not clearly erroneous.
 
 D.
 
 82
 Defendant argues that the district court's finding that his base offense level under U.S.S.G. Sec. 2D1.1 was 32 was clearly erroneous. Defendant asserts that the district court's finding as to the quantity of drugs involved in the conspiracy to distribute marijuana was clearly erroneous because it relied, at least in part, on the testimony of Mr. Herrera. Defendant also asserts that the amount of marijuana attributed to him by the district court, as part of the conspiracy, was not reasonably foreseeable.
 
 
 83
 In determining the amount of drugs involved in the conspiracy, the district court stated:
 
 
 84
 I find that the base offense level in this case is 32 in that the quantity of drugs is in excess of 1,000 kilos. The offense level should be determined by the amount of drugs in the defendant's relevant conduct, not just amounts in the offense of conviction or charged in the indictment.
 
 
 85
 ............................................................
 
 
 86
 ....................
 
 
 87
 * * *
 
 
 88
 I note that--and this is the situation we're involved with here in my judgment--where all the drugs are not seized, the Court must estimate the amount involved in the relevant conduct and err on the side of caution.
 
 
 89
 * * *
 
 
 90
 Mr. Herrera testified as to a long-term conspiracy and business of drug dealing with Mr. Torres. He said that he was a partner of Mr. Torres. He said that he and Mr. Torres split the profits. He said that he kept two sets of books, one for himself and one for Mr. Torres.
 
 
 91
 He also testified as to how they divided responsibilities. Mr. Torres was responsible for obtaining the marijuana. Mr. Herrera was responsible for distributing the marijuana.
 
 
 92
 In open court before me. Mr. Herrera pled guilty to distributing over 1,000 kilos of marijuana as part of this conspiracy.
 
 
 93
 * * *
 
 
 94
 There is Mr. Herrera's testimony as to four or five loads per year at 150 pounds per load average. And once again, I'm making a reasonable estimate in my judgment. If you take four trips per year, even if you take five years, you're well over the 1,000 kilos. If you take four years, your well over the 1,000 kilos. So it's that testimony of Mr. Herrera that I credit.
 
 
 95
 J.A. 347-49, 351.
 
 
 96
 Findings of fact relating to the calculation of a defendant's offense level must be made by a preponderance of the evidence. United States v. Walton, 908 F.2d 1289, 1301 (6th Cir.), cert. denied. 498 U.S. 906 and 989 and 990 (1990). "A district court's decision on the amount of [drugs] a defendant is to be held accountable for is a finding of fact which must be accepted by a court of appeals unless clearly erroneous." Id. Furthermore, a district court cannot "hold a defendant responsible for a specific quantity of drugs unless the court can conclude the defendant is more likely than not actually responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible. If the exact amount cannot be determined, an estimate will suffice, but here also a preponderance of the evidence must support the estimate." Id. at 1302. Moreover, in determining the amount of drugs for which a defendant is to be held accountable, "the district court should ... establish[ ] the quantity of drugs by adding up the total amount sold during the lifetime of the conspiracy." United States v. Hodges, 935 F.2d 766, 772 (6th Cir.), cert. denied, 112 S.Ct. 251 and 317 (1991).
 
 
 97
 The presentence report in this case stated that "defendant supplied or attempted to supply approximately 7147 pounds or 3248.6 kilograms of marijuana." J.A. 54. Hence, the presentence report recommended that defendant's base offense level should be 34. However, the district court rejected this recommendation and found that the total amount of marijuana involved in the conspiracy was in excess of 1,000 kilograms, and, consequently, defendant's base offense level was 32.[5] Defendant asserts that because the district court relied on Mr. Herrera's testimony, "it would seem safer to err on the side of caution, reducing [defendant's] offense level to below 1000 kilograms or a base level of 30." Brief of Appellant at 10.
 
 
 98
 In this case, the district court's finding that defendant's base offense level is 32, i.e., that the distribution conspiracy involved at least 1000 kilograms of marijuana, is not clearly erroneous. Although the district court's finding is an estimate, it is an entirely reasonable estimate of the amount of drugs involved.
 
 
 99
 As to defendant's claim that the amount of drugs involved in the conspiracy to distribute marijuana was not reasonably foreseeable to him, there was evidence that defendant was the participant in the conspiracy who was responsible for the procurement of the marijuana. The district judge observed Herrera's trial testimony and, thus, is in the best position to determine that the testimony was credible. Finally, the district court's estimate of the amount of drugs involved in the crime is reasonable. Therefore, we conclude that the district court's finding that defendant's base offense level was 32 was not clearly erroneous.
 
 III.
 
 100
 For the reasons stated, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 On the first day of trial, August 30, 1993, the district court granted the government's motion to dismiss the indictment, with prejudice, against Norma Sanchez. Moreover, prior to the start of trial, two of defendant Torres' co-defendants pled guilty. On April 13, 1993, Eugenio Casias pled guilty, pursuant to a plea agreement, to the charge in count one of the information which had been filed against him. Likewise, on June 22, 1993, Bernard Soltis pled guilty, pursuant to a plea agreement, to the charge in count one of the superseding information which had been filed against him
 
 
 [2]
 Librado Herrera testified that he was commonly known by his nickname, Lee, rather than by Librado. Although Herrera is referred to both as Lee Herrera and Librado Herrera throughout the record, we will refer to him as Lee Herrera herein
 
 
 [3]
 Interpreters were also present at defendant's sentencing hearing
 
 
 [4]
 Fed.R.Evid. 801 states in relevant part:
 (d) Statements which are not hearsay. A statement is not hearsay if--
 * * *
 (2) Admission by a party-opponent. -- The statement is offered against a party and is ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.
 5 U.S.S.G. Sec. 2D1.1(c), the drug quantity table, states that the base offense level is 34 for crimes involving at least 3000 kg but less than 10,000 kg of marijuana; and, the base offense level is 32 for crimes involving a least 1000 kg but less the 3000 kg of marijuana.